UNITED STATES of America,
Appellee,

v.

Yuri GARCIA, aka "Bonitillo," and Francisco Valentin, aka "Chanchi," Defendants–Appellants,

v.

Alejandro Tejada, LNU1–02CR0477–002, Walmer Dearmas, Gabriel Herrera, and Jacobo Carmona, Defendants.

Docket Nos. 03–1407–CR(L),
03–1429–CR(CON).

United States Court of Appeals,
Second Circuit.

Argued: Nov. 22, 2004.

Decided: June 21, 2005.

Brendan White (Diarmuid White, on the brief), White & White, New York, New York, for Defendant–Appellant Yuri Garcia.

Glenn A. Garber, Glenn A. Garber, P.C., New York, New York, for Defendant–Appellant Francisco Valentin.

Katherine Polk Failla, Assistant United States Attorney (Christopher P. Conniff and Peter G. Neiman, Assistant United States Attorneys, on the brief), for David N. Kelley, United States Attorney for the Southern District of New York, New York, New York, for Appellee.

Before: CALABRESI, B.D. PARKER, and RAGGI, Circuit Judges.

Judge CALABRESI concurs in the majority opinion and in a separate concurring opinion.

RAGGI, Circuit Judge.

Defendants–Appellants Yuri Garcia and Francisco Valentin appeal from judgments of conviction entered against them on June 23, 2003, and July 3, 2003, respectively, in the United States District Court for the Southern District of New York (Robert J. Ward, *Judge*) on charges of conspiracy to distribute or possess with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A), 846, and substantive distribution or possession with intent to distribute of approximately ten kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).[1] Garcia, whose conviction was based on a jury verdict, submits that the district court erred in allowing a case agent to offer opinion testimony ascribing a partnership role to Garcia in the charged cocaine distribution

---

1. Although the enhanced sentence provision of § 841(b)(1)(A) is triggered by trafficking in amounts of five kilograms or more of cocaine, the substantive count of the indictment specifically charged ten kilograms or more of cocaine.

scheme. He further challenges his 292–month sentence of incarceration on the grounds that the district court erroneously enhanced his sentence pursuant to U.S.S.G. § 3B1.1(c) and improperly calculated his Sentencing Guidelines range by reference to facts neither proved beyond a reasonable doubt to the jury nor supported by a preponderance of the evidence. Valentin, whose conviction was based on a guilty plea, similarly raises a Sixth Amendment challenge to his sentence and also asserts that his former counsel's failure to raise a preponderance challenge to the district court's calculation of his Guidelines range constituted constitutionally ineffective representation.

We agree with Garcia that the agent's opinion testimony at trial as to Garcia's culpable role in the charged crimes was not properly received. Although the government argues that this testimony was admissible under Federal Rule of Evidence 701 as a lay opinion summary of anticipated evidence, we conclude that the necessary predicates of that rule were not satisfied in this case. Nevertheless, because this evidentiary error was harmless, we affirm so much of Garcia's judgment of conviction as reflects the jury verdict of guilty.

As for defendants' sentencing challenges, we conclude that the district court's Guidelines calculations are supported by a preponderance of the evidence. To the extent Garcia argues otherwise or Valentin claims that his attorney was constitutionally ineffective in failing to raise a preponderance challenge, we reject these arguments as without merit. Insofar as defendants invoke *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), to support a Sixth Amendment

challenge to the Guidelines that was never presented to the district court, we review only for plain error. *See* Fed.R.Crim.P. 52(b). That review is, of course, now informed by *United States v. Booker,* 543 U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), which holds that the Sixth Amendment right to trial by jury precludes a district court from relying on facts not admitted by the defendant or proved beyond a reasonable doubt to a jury to increase sentencing ranges pursuant to a mandatory Guidelines scheme, *see id.* at 764. Because defendants' sentences were imposed pursuant to what, prior to *Booker,* had been a uniform understanding in the federal courts that the Sentencing Guidelines were mandatory, we are obliged to find that there was error in this case that is now plain. *See United States v. Williams,* 399 F.3d 450, 460 (2d Cir.2005); *see also Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (holding that "it is enough that an error be 'plain' at the time of appellate consideration"). For reasons discussed in *Williams,* as well as in *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005), we remand the case to the district court for further proceedings necessary to determine whether any such error affected substantial rights so as to require resentencing.[2]

## I. *Background*

### A. *The Charges and Guilty Pleas*

On May 2, 2002, a grand jury sitting in the Southern District of New York charged Yuri Garcia and Francisco Valentin, together with Alejandro Tejada, Walmer DeArmas, Gabriel Herrera, Jacobo Carmona, and an individual identified only

---

**2.** Prior to filing, this opinion has been circulated to all members of this Court. *See, e.g., United States v. Crosby,* 397 F.3d at 105 n. 1;

*United States v. Mincey,* 380 F.3d 102, 103 n. 1 (2d Cir.2004).

as "El Papa," with conspiring between November 2001 and May 2002 to distribute or possess with intent to distribute five or more kilograms of cocaine. The same indictment charged that, on or about March 20, 2002, Garcia, Valentin, Tejada, and DeArmas did, in fact, distribute or possess with intent to distribute approximately ten kilograms of cocaine. In the weeks immediately preceding the scheduled November 6, 2002 trial, all defendants except Garcia pleaded guilty. Most significantly for purposes of this appeal, Tejada pleaded guilty on October 1, 2002, pursuant to a cooperation agreement with the government that resulted in his testifying as a prosecution witness against Garcia at trial. Soon thereafter, on October 31, 2002, Valentin pleaded guilty, admitting that he "got together with some friends" and "made some phone calls" as part of a conspiracy to transport ten kilograms of cocaine to Manhattan on March 20, 2002, during which time he exercised "some control over what happened to that cocaine." Plea Tr., Oct. 31, 2002, at 16–17.

### B. *Garcia's Trial*

To prove Garcia's guilt at trial, the government relied on (1) the testimony of co-defendant Tejada, (2) telephone conversations among the conspirators recorded pursuant to court orders, (3) the surveillance observations of law enforcement officers who participated in the investigation of the charged conspiracy, and (4) physical items seized from the conspirators following their arrests. Because our resolution of this appeal requires harmless error analysis, we discuss this evidence in some detail.

#### 1. *The Evidence of Garcia's Guilt*

##### a. *Tejada's Testimony*

Alejandro Tejada testified that he became involved in cocaine trafficking with Francisco Valentin and Yuri Garcia in 2000 at the behest of his long-time friend Valentin. Essentially, Tejada acted as a courier, who, on approximately fifteen to twenty occasions between the summer of 2001 and March 2002, picked up and delivered multi-kilogram quantities of cocaine. Tejada could not always recollect whether it was Valentin or Garcia who gave him the necessary instructions as to each particular transport because the two men were generally both present and participating during these encounters. Nevertheless, Tejada unequivocally testified that he received directions from each man many times. Tejada stated that when he delivered cocaine, it was Garcia who always inspected the drugs to confirm their quality. Further, Tejada stated that Garcia was in charge of the operation's finances.

Tejada testified that, on March 18, 2002, he picked up a quantity of cocaine and delivered it to Valentin and Garcia. When the three men unpackaged the drugs, Garcia pronounced them to be "garbage," Trial Tr. at 241, prompting Valentin to call and complain to his direct supplier, Walmer DeArmas. Two days later, on March 20, 2002, as Tejada attempted to return the unsatisfactory drugs to DeArmas, he was arrested by law enforcement authorities who seized the ten kilograms of cocaine then in his possession.

##### b. *The Intercepted Telephone Calls and Surveillance*

In a series of recorded telephone conversations played for the jury, Valentin and Garcia discussed their drug operation with each other as well as with fellow conspirators. We focus here on calls relating to the charged March 20, 2002 transaction.

On the morning of March 18, 2002, Valentin and DeArmas discussed an imminent drug transaction and squabbled over

price. Later that same day, DeArmas proposed consummating the deal at the site of a previous meeting, whereupon Valentin stated that he would "talk to *Yuri*, because it was *Yuri* who was driving the last time." Gov't Ex. 106T at 5 (emphasis added). In another call that evening, Valentin told DeArmas that he was putting "Bonitillo" on the telephone to discuss the meeting site. Gov't Ex. 107T at 16. The monitoring interpreter, who had an opportunity to listen to a voice exemplar given by Garcia, identified Garcia as the person next heard on the recording agreeing to meet DeArmas at "the place where we went that time." *Id.*[3]

Case agent Paul Klemick of the Drug Enforcement Administration ("DEA") testified that, at the appointed time, he and other law enforcement officials surveilled the meeting site, which was in the vicinity of the Clearview Expressway and Union Turnpike in Queens, New York. There, Klemick spotted a parked Toyota Camry registered to DeArmas's home address. He further observed two men in a blue Jeep registered to Sophia Toribio, Garcia's common-law wife, at the same address as that on a New York State driver's license in the name of "Yuri Garcia." For a brief time, agents followed the Jeep, but soon after the vehicle began to engage in "evasive action," they abandoned the endeavor. Trial Tr. at 114.

Nevertheless, a telephone conversation intercepted shortly after midnight on March 19, 2002, revealed that the planned drug exchange had, in fact, occurred, but not to the satisfaction of the defendants. Valentin was intercepted telling DeArmas, "I am waiting for, eh ... 'Bonitillo' is opening one of them." Gov't Ex. 108T at 2. A few seconds later, Valentin reported that the cocaine was "like chalk" and asked DeArmas, "How can that be?" *Id.* at 3. Valentin was then overheard stating to someone in the background, "Yuri, open up another one, so we can take a look," immediately after which Garcia replied, "This is no good." *Id.* at 3–4. As Valentin and DeArmas quarrelled, the former stated, "Yuri is now opening another" package. *Id.* at 5. A moment later Garcia pronounced, "This one is even uglier." *Id.* at 6.

In a series of calls on the evening of March 19, 2002, DeArmas, Valentin, and Garcia planned a meeting to discuss the bad batch of cocaine. Initially, Garcia urged DeArmas to meet him in the Bronx, only to change the site in a subsequent call to Dyckman Street off the Henry Hudson Parkway in Manhattan.

Agent Klemick testified that, at the latter site, he saw both the blue Jeep registered to Sophia Toribio and DeArmas's Toyota. Police Detective Ronald Nicastro, also part of the surveillance team, testified that he was able to observe the driver of the Jeep and, based on a license photograph obtained from the New York State Department of Motor Vehicles, identified him as Yuri Garcia. Authorities fol-

---

**3.** Although the defense questioned the witness's qualifications to make a voice identification, the challenge appears to have been little more than a distraction. The prosecution did not present the interpreter as an expert in voice identification, but as a lay witness who had acquired considerable familiarity with the intercepted voices from her work monitoring the wiretap. *See* Fed. R.Evid. 701. Indeed, the prosecution invited the jury to make its own comparison of Gar-cia's voice exemplar with the voice it contended was his on the intercepted tapes. *See* Trial Tr. at 385–86, 422–24. In any event, Garcia's identity as the speaker on a number of the intercepted calls could not seriously be disputed in light of Tejada's testimony as well as surveillance observations, discussed *infra,* which placed Garcia (or a vehicle linked to him) at specific sites soon after recorded calls in which the speaker alleged to be Garcia agreed to meet at the same locations.

lowed both cars to 525 Riverdale Avenue in the Bronx, a location that Tejada identified at trial as Valentin's and Garcia's stash house. There, Nicastro saw Garcia and DeArmas enter the building.

The following day, March 20, 2002, Garcia and DeArmas were intercepted discussing the return of the unsatisfactory cocaine. Garcia indicated that he would arrange for "Negro"—which Tejada testified was a name by which he was sometimes called, *see* Trial Tr. at 20—to deliver the drugs. Gov't Ex. 112T at 3. In a subsequent conversation, intercepted shortly after 7:00 p.m., DeArmas and Garcia expressed concern that the delivery had not proceeded as planned:

DeArmas: What's happened?

Garcia: I don't know yet.

DeArmas: Where are you?

Garcia: I'm up here already.

DeArmas: Should we go up there, to see if maybe the man arrived, and left the stuff there or something?

Garcia: No, I don't want to take that risk of going inside there.

DeArmas: But we have to find out what's going on somehow, right?

Garcia: Yes, we have to find out what's going on . . . .

Gov't Ex. 113T at 1–2.

What had happened, of course, was that agents had arrested Tejada in possession of ten kilograms of cocaine outside DeArmas's stash house on East 72nd Street in Manhattan. Later that night, Garcia and DeArmas were overheard discussing Tejada's arrest and the need to secure legal representation for him. *See* Gov't Ex. 114T.

Thereafter, relations among the conspirators grew strained as DeArmas pressed Garcia and Valentin for payment owed on previous drug deals, while Garcia and Valentin complained about the financial problems resulting from the March 20, 2002 seizure. In a May 2, 2002 conversation, Garcia and Valentin computed their debt to DeArmas as $81,000. On May 5, 2002, Garcia proposed to DeArmas that they meet the following day to discuss this obligation. In anticipation of this meeting, on May 6, 2002, Garcia and Valentin discussed making a partial payment of $9,000 to DeArmas, with Garcia promising Valentin that he would bring "the papers, the list" to the meeting. Gov't Ex. 126T at 2.

### c. *The Physical Evidence Seized from Defendants*

Det. Nicastro and other agents surveilled Garcia on May 6, 2002, observing him pick up Valentin first and then DeArmas. Soon thereafter, law enforcement authorities arrested the three men. From the van in which the trio was traveling, officers seized $9,000 in cash; a cellular telephone that had been used to place some of the intercepted calls; and, after a subsequent, more thorough search, "drug records" detailing an $81,000 indebtedness.

### 2. *Agent Klemick's Opinion Testimony*

Preliminary to presenting the above-described evidence for jury review,[4] the government elicited background and opinion testimony from Agent Klemick, some of which is challenged on this appeal. Without objection, Klemick, as one of two case agents, testified briefly to certain techniques used by law enforcement officials in

---

**4.** The intercepted telephone calls and translated transcripts were, in fact, authenticated and received in evidence before Agent Klemick testified but not presented for jury review until after Klemick offered the challenged opinion testimony.

the investigation of the charged conspiracy, specifically, wiretaps, surveillance, cooperator debriefings, and review of law enforcement databases. *See* Trial Tr. at 92. The prosecution then asked Klemick if, "based on your investigation," he could identify certain persons. *Id.* at 95. Beginning with Walmer DeArmas, Klemick testified, without objection, that "[w]e identified [him] as one of Gabriel Herrera's sources of supply for cocaine." *Id.* In response to a similar inquiry regarding Francisco Valentin, Klemick stated that "[h]e was a partner of Walmer DeArmas and of Yuri Garcia in the drug conspiracy." *Id.* at 96. A defense objection to "the characterization" was sustained, and the response stricken from the record. *Id.* When the question was rephrased, however, and a response given that omitted specific reference to Garcia, the court overruled a defense objection to the agent offering conclusory testimony:

> Q: Based on your investigation, who or what role was played by Francisco Valentin?
>
> A: Francisco Valentin was basically a partner with Walmer DeArmas who supplied cocaine to DeArmas.
>
> Q: And how were you able to determine this?
>
> A: Through intercepted -
>
> [DEFENSE COUNSEL]: Your Honor, again, I would just object to the conclusion. I mean, that's -
>
> [PROSECUTOR]: Your Honor, the question is phrased in terms of based on their investigative work. It is the conclusion that the agent reached in the course of his investigation.
>
> THE COURT: Overruled.
>
> Q: How were you able to determine this?

> A: Through intercepted phone conversations and research of law enforcement database and surveillance.

*Id.* at 96–97.

The prosecution then proceeded to ask Klemick to testify specifically as to Garcia's role, prompting an objection, a rephrasing of the question by the court, and the response challenged on this appeal:

> Q: In the course of your investigation, were you able to determine what role, if any, Yuri Garcia played in the organization?
>
> A: Yes.
>
> Q: And what role did he play based on your investigation?
>
> [DEFENSE COUNSEL]: Objection, your Honor, as to role. If the question is: What did he see? What did he do? That's one thing, but when it talks about role, it opens up a whole other -
>
> THE COURT: As far as you could determine, what did he do?
>
> Q: That was the question.
>
> A: *As far as our investigation determined, he was a partner with Francisco Valentin in receiving cocaine from Walmer DeArmas and he also helped to test the cocaine to make sure that it was a quality product.*

*Id.* at 97–98 (emphasis added).

Klemick subsequently testified, without objection, to a further conclusion reached by him in the course of the conspiracy investigation, specifically, the identity of a person referred to by Valentin in an intercepted call as "Bonitillo." Klemick stated that, based on "intercepted phone calls, through surveillance and through interviews of cooperating witnesses," he was able to identify "Bonitillo" as "[t]he defendant, Yuri Garcia." *Id.* at 103. When asked if "[b]ased on your participation in

the investigation," he had an understanding of the role of Alejandro Tejada, Klemick testified, again without objection, that Tejada "transported drugs." *Id.* at 106.

## II. *Discussion*

### A. *The Admission of Agent Klemick's Testimony as to Garcia's Role in the Charged Crimes Was Harmless Error*

#### 1. *The Standard of Review*

 We review a district court's decision to admit evidence for abuse of discretion, *see Old Chief v. United States*, 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir.2004), and we will reverse only if an error affects a "substantial right," Fed.R.Evid. 103(a). An evidentiary error affects substantial rights if it had a "substantial and injurious effect or influence" on the jury's verdict. *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir.2003) (internal quotation marks omitted). Thus, where a court, upon review of the entire record, "is sure that the [evidentiary] error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . ." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In this case, we conclude that Agent Klemick's testimony as to Garcia's role in the charged conspiracy was not admissible as lay opinion testimony pursuant to Fed. R.Evid. 701, the sole theory relied on by the government.[5] Nevertheless, reversal is not warranted because the record permits us confidently to conclude that the agent's opinion had no substantial influence on the jury verdict and, therefore, that the evidentiary error was harmless.[6]

#### 2. *Klemick's Testimony as to Garcia's Role in the Charged Crimes Was Not Admissible as Lay Opinion Testimony Under Rule 701*

 We begin by identifying the overarching concern raised by Agent Klemick's testimony. By stating that, in his opinion, Garcia was a "partner with Francisco Valentin in receiving cocaine from Walmer DeArmas," Trial Tr. at 98, Klemick was essentially telling the jury that he had concluded that Garcia was guilty of the crimes charged. Although opinion testimony, whether offered by a lay witness pursuant to Fed.R.Evid. 701, or by an expert pursuant to Fed.R.Evid. 702, is not inadmissible simply "because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Evid. 704, it is not properly received "merely [to] tell the jury what result to reach," *id.*, Advisory Committee Notes on 1972 Proposed Rules; *see* 4 *Weinstein's Federal Evidence* § 701.05 (2d ed.2004) (noting that courts should be wary of opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations"). Indeed, the purpose of the foundation requirements of the federal rules governing opinion evidence is to en-

---

**5.** The government does not contend that the challenged testimony was admissible as an expert opinion pursuant to Fed.R.Evid. 702.

**6.** We note that, at oral argument, the government abandoned a challenge raised in its appellate brief to the specificity of Garcia's objection to Klemick's testimony. Thus, we do not address that issue in this opinion. At the

same time, the government virtually conceded the inadmissibility of the challenged testimony, devoting most of its time to arguing harmlessness. While we agree with the latter argument, we think it useful to discuss the specific reasons why Klemick's challenged testimony was not admissible as lay opinion.

sure that such testimony does not so usurp the fact-finding function of the jury. *See* Fed.R.Evid. 704, Advisory Committee Notes on 1972 Proposed Rules.

Mindful of this concern, this court has, in two recent cases—both decided after the trial of this case—ruled it error to allow law enforcement witnesses to express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigations. *See United States v. Grinage*, 390 F.3d at 749–51 (rejecting receipt of such evidence as lay opinion under Rule 701); *United States v. Dukagjini*, 326 F.3d at 54 (rejecting receipt of such evidence as expert opinion under Rule 702). The circumstances of this case warrant no different conclusion. They do, however, afford us an opportunity to discuss the particular foundation requirements of Rule 701 and to reject the argument advanced by the government in its brief that a case agent may offer, at the beginning of a trial, a lay opinion providing a summary overview of anticipated evidence. *See* Appellee's Br. at 27–28.

■ Rule 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed.R.Evid. 701. It is the proponent of lay opinion testimony who must satisfy the rule's three foundation requirements. *See United States v. Grinage*, 390 F.3d at 749. In this case, the record reveals that the government failed to establish any of the specified prerequisites for lay opinion testimony.

a. *The "Personal Perception" Requirement*

■ Rule 701 requires lay opinion testimony to be based on the witness's personal perceptions. *See* Fed.R.Evid. 701(a). The "traditional objective" of the rule is, after all, to afford the trier of fact "an accurate reproduction of the event" at issue. *Id.*, Advisory Committee Notes on 1972 Proposed Rules. Recognizing that eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts, the law permits such witnesses to testify to their personal perceptions in the form of inferences or conclusory opinions. *See id.*, Advisory Committee Notes on 1972 Proposed Rules and on 2000 Amendments; *see also* 4 *Weinstein's Federal Evidence* § 701.03[4][b] (detailing subjects on which lay opinion testimony has been received). In short, Rule 701 represents no departure from Fed.R.Evid. 602: "A witness may not testify to a matter until evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter." Rather, Rule 701 simply recognizes lay opinion as an acceptable "shorthand" for the "rendition of facts that the witness personally perceived." 4 *Weinstein's Federal Evidence* § 701.03[1].

To illustrate: when an undercover agent participates in a hand-to-hand drug exchange with a number of persons, the agent may well testify that, in his opinion, a particular participant, "X," was the person directing the transaction. Such an opinion is based on his personal perception of such subjective factors as the respect various participants showed "X," their deference to "X" when he spoke, and their consummation of the deal only upon a subtly signaled approval by "X." By allowing

the agent to state his opinion as to a person's role in such circumstances, Rule 701 affords the jury an insight into an event that was uniquely available to an eyewitness. In this respect, the rule recognizes the common sense behind the saying that, sometimes, "you had to be there."

In *United States v. Grinage,* however, this court recently recognized that when an agent relies on the "entirety" or "totality" of information gathered in an investigation to offer a "lay opinion" as to a person's culpable role in a charged crime, he is not presenting the jury with the unique insights of an eyewitness's personal perceptions. 390 F.3d at 750–51. Thus, in such circumstances, the investigatory results reviewed by the agent—if admissible—can only be presented to the jury for it to reach its own conclusion.

Perhaps anticipating *Grinage,* the government, in its brief, argued that, because the question eliciting Klemick's opinion as to Garcia's role was framed in the second person, "[i]n the course of *your* investigation, were *you* able to determine what role, if any, Yuri Garcia, played in the organization," Trial Tr. at 97 (emphasis added), and because an interjecting question by the court was similarly framed, "[a]s far as *you* could determine, what did [Garcia] do," *id.* at 98 (emphasis added), we can reasonably infer that Klemick's response was not based on the totality of the agents' investigation but only on the witness's personal perceptions. In fact, the record does not support this conclusion.

Klemick's response indicates that his opinion was not limited to his personal perceptions but drew on the total informa-

tion developed by all the officials who participated in the investigation leading to Garcia's arrest: "As far as *our* investigation determined, [Garcia] was a partner with Francisco Valentin in receiving cocaine . . . ." *Id.* (emphasis added). Indeed, that conclusion is reinforced by placing the quoted language in context. The inquiry as to persons' roles was immediately preceded by a series of questions about the investigation, to which Klemick routinely responded by reference to the collaborative efforts of a team of law enforcement officers. Asked to "describe some of the investigative techniques that you used in carrying out the investigation," Klemick replied, "*We* used wiretaps. *We* did surveillance. *We* researched law enforcement databases. *We* interviewed cooperators." *Id.* at 92 (emphasis added). He similarly described the procurement of wiretap evidence as a collective task: "We submitted an affidavit to the Court"; "we were permitted to intercept conversations for a period of 30 days"; "we'd . . . apply to renew for another 30 days." *Id.* at 93.[7] Further, Klemick referred to efforts to identify the members of the conspiracy as a joint rather than personal endeavor: "We wanted to identify members of this drug conspiracy and gather evidence against them and be able to arrest them and bring a case." *Id.* at 94. Moreover, in his first opinion as to a person's role in the conspiracy, Klemick appeared to rely on the collective perceptions of the investigative team, not simply on his own: "We identified [Walmer DeArmas] as one of Gabriel Herrera's sources of supply for cocaine." *Id.* at 95. At no time did the government ask Klemick to limit his conclusion to facts about which he

7. With respect to the wiretap evidence, we note that most of the intercepted conversations were in Spanish. Because no evidence was adduced indicating Klemick's fluency in this language, it appears that any opinions he formed from his review of the recorded con-

versations could not have been based on his personal perceptions of the participants' discussions but were necessarily informed by what he was told by Spanish-speaking monitors and translators.

had personal knowledge. Thus, when a few questions later, the agent testified that, "[a]s far as our investigation determined, [Garcia] was a partner with Francisco Valentin in receiving cocaine," *id.* at 98, the fair inference is that he was expressing an opinion informed by all the evidence gleaned by various agents in the course of the investigation and not limiting himself to his own personal perceptions.

That Klemick's opinion was so based is hardly surprising. It is entirely reasonable and responsible for law enforcement officers, in performing their day-to-day duties, to rely on the collective knowledge of their colleagues. The law recognizes and approves this reality in the standards it applies to probable cause challenges. *See United States v. Cruz,* 834 F.2d 47, 51 (2d Cir.1987) (noting that "determination of whether probable cause to arrest exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts" so long as "the various law enforcement officers in this investigation were in communication with each other"); *see also United States v. Waldrop,* 404 F.3d 365, 370 (5th Cir.2005); *Thacker v. City of Columbus,* 328 F.3d 244, 256 (6th Cir.2003); *Dubner v. City & County of San Francisco,* 266 F.3d 959, 966 (9th Cir.2001). The same is true of grand jury presentations. *See United States v. Lamela,* 942 F.2d 100, 104 n. 5 (1st Cir.1991) ("[I]t is common practice ... for the government to present [to the grand jury] an overview of the criminal investigation through the testimony of the case agent, rather than through the testimony of the investigating officers."); *see also United States v. Ruggiero,* 934 F.2d 440, 447 (2d Cir.1991) ("It is entirely permissible for the government to use hearsay evidence in its presentation to the grand jury."). But these situations are distinguishable in that they are not governed by the Federal Rules of Evidence applicable to trials. *See*

*generally United States v. Dukagjini,* 326 F.3d at 54 (noting that, "[when] the testimony of the case agent ... provid[es] an overall conclusion of criminal conduct, the process tends to more closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others that is not part of the record"). Precisely because Rule 701 limits the admissibility of lay opinions at trial to those based only on personal perceptions, an opinion such as Agent Klemick's, which appears to have been based on the totality of information gathered by various persons in the course of an investigation, was not admissible before a jury.

b. *The "Helpful to the Jury" Requirement*

A lay opinion may be received in evidence only if it is "helpful" to the jury's "clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701(b). The government submits that Klemick's testimony satisfied this requirement because "it provided a simple summary for the jury of what Klemick saw Garcia do during the surveillance and what Klemick heard Garcia and others say on the wiretaps." Appellee's Br. at 27–28. We reject this argument for several reasons.

First, as already observed, Agent Klemick's opinion was not limited to a summary of his own observations.

Second, Klemick's opinion did more than provide a "summary" of Garcia's words and actions—by whomever they were observed. It told the jury that Klemick, an experienced DEA agent, had determined, based on the total investigation of the charged crimes, that Garcia was a culpable member of the conspiracy. Such an opinion cannot be equated with that of an undercover officer who, in testifying to his

direct dealings with a group of persons, may offer an opinion as to what the words and actions witnessed conveyed about the relative relationships of the participants. The latter opinion helps the jury gain "an accurate reproduction of the event" actually witnessed by the agent. Fed.R.Evid. 701(a), Advisory Committee Notes on 1972 Proposed Rules. It does not tell them that unspecified information, which may or may not be received in evidence, establishes a defendant's guilt. *See generally United States v. Grinage,* 390 F.3d at 750 (explaining that jurors were not "helped" within the meaning of Rule 701 by opinion testimony that, in addition to telling them "what was in the evidence," also told them "what inferences to draw from it"); *cf. United States v. Boissoneault,* 926 F.2d 230, 233 (2d Cir.1991) (expressing "discomfort with expert testimony in narcotics cases that not only describes the significance of certain ... evidence in general, but also draws conclusions as to the significance of that ... evidence in the particular case"). As *Grinage* observed, if such broadly based opinion testimony as to culpability were admissible under Rule 701, "there would be no need for the trial jury to review personally any evidence at all." 390 F.3d at 750. The opinion witness could merely tell the jury what result to reach. This, however, is precisely what the second foundation requirement of Rule 701 is meant to protect against. *See id.* at 749 (noting that "foundational requirement of Rule 701(b) ... 'is designed to provide "assurance[ ] against the admission of opinions which would merely tell the jury what result to reach." ' " (quoting *United States v. Rea,* 958 F.2d 1206, 1215 (2d Cir.1992) (quoting Fed.R.Evid. 704, Advisory Committee Notes on 1972 Proposed Rules))).

■ Even if Klemick's opinion as to Garcia's culpability could be viewed as a summary of the evidence that was subsequently admitted at trial, there is a third reason why it fails to qualify as "helpful" under Rule 701(b): it is generally viewed as "improper ... for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury." 6 *Weinstein's Federal Evidence* § 1006.04[3]. Indeed, as two of our sister circuits have observed, this practice is particularly problematic in criminal cases because it allows "the government to paint a picture of guilt before the [supporting] evidence has been introduced." *United States v. Griffin,* 324 F.3d 330, 349 (5th Cir.2003); *see United States v. Casas,* 356 F.3d 104, 119 (1st Cir.2004) (observing that agent's overview testimony essentially stated "that each of the defendants was guilty of the conspiracy charged").[8] We share this concern and similarly condemn the practice of having a case agent offer a summary opinion as to culpability before any evidence to support such a conclusion has been presented for jury review.

The law already provides an adequate vehicle for the government to "help" the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability: the opening statement. In this case, the prosecution, in its opening remarks, repeatedly identified Garcia as a "partner" with Francisco Valentin in the acquisition and distribution of kilogram quantities of cocaine, with Garcia having particular responsibility for ensuring the quality of their illicit product.

---

**8.** The First Circuit, in *United States v. Cunningham,* 359 F.3d 627, 627 (1st Cir.2004), clarified its holding in *Casas,* explaining that Double Jeopardy did not bar the government from retrying Cunningham, the only defendant as to whom *Casas* had found evidentiary error that was not harmless. Since we conclude that the error in this case was harmless, *Cunningham's* gloss on *Casas* is not relevant to our analysis.

Trial Tr. at 36, 38–39, 42–43. Such an overview presented no risk of prejudice because the jury was specifically instructed that the opening statements of counsel "are not evidence." *Id.* at 32. With the benefit of such an overview, a jury receives no further meaningful assistance in the performance of its fact-finding role from having a case agent state *as evidence* that, in his opinion, based on the totality of the investigation, defendant was a culpable member of the charged conspiracy. As we observed in *Grinage*, when a jury hears that an agent's opinion is based on the total investigation, there is a risk that it may improperly defer to the officer's opinion, thinking his knowledge of pertinent facts more extensive than its own. 390 F.3d at 750. It is, however, the jury's singular responsibility to decide from the evidence admitted at trial whether the government has carried its burden of proof beyond a reasonable doubt.

■ For all these reasons, we reject the government's argument that a case agent's opinion as to a defendant's culpable role provides a jury with a helpful summary overview of the evidence.

### c. The "Not Based on Specialized Knowledge" Requirement

In 2001, Rule 701 was amended to provide that testimony cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge. *See* Fed.R.Evid. 701(c). Rather, a lay opinion must be the product of reasoning processes familiar to the average person in everyday life. *See id.,* Advisory Committee Notes to 2000 Amendments (explaining that "lay testimony 'results from a process of reasoning familiar in everyday life,'

while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field' " (quoting *State v. Brown,* 836 S.W.2d 530, 549 (Tenn. 1992))).[9]

■ The purpose of this final foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R.Crim.P. 16 and Fed.R.Civ.P. 26. *See* Fed.R.Evid. 701, Advisory Committee Notes on 2000 Amendments; *see also Bank of China v. NBM LLC,* 359 F.3d 171, 182 nn. 12–13 (2d Cir.2004) (discussing interplay of Fed.R.Evid. 701 and 702 with mandatory disclosure obligations). Thus, in considering the third prerequisite for lay opinion testimony, a court must focus on "the reasoning process" by which a witness reached his proffered opinion. 4 *Weinstein's Federal Evidence* § 701.03[1]. If the opinion rests "in any way" upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701. *Id.; see* Fed.R.Evid. 701, Advisory Committee Notes to 2000 Amendments ("The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702."); *see also Bank of China v. NBM LLC,* 359 F.3d at 182 (finding error in admission of evidence under Fed.R.Evid. 701 that was "not a product of [witness's] investigation" but rather "reflected [his] specialized knowledge").

---

9. To the extent the government relies on cases that pre-date this 2000 amendment to support its argument that a law enforcement officer may offer opinion testimony as to the criminality of actions witnessed by him, we do not find such cases particularly useful to our analysis.

■ In this case, the government made no attempt to demonstrate that Klemick's challenged opinion was informed by reasoning processes familiar to the average person in everyday life rather than by scientific, technical, or other specialized knowledge. Indeed, it appears to have considered the basis of his opinion irrelevant, arguing that Klemick could express an opinion as to various persons' roles in the charged conspiracy as long as the opinion was "reached in the course of his investigation" and "based on their investigative work." Trial Tr. at 97. We hold that the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience. The record in this case indicates that Klemick's expertise in narcotics trafficking did so inform the challenged opinion.

Klemick testified that his opinion as to the various conspirators' roles was based on "intercepted phone conversations and research of law enforcement databases and surveillance." *Id.* Focusing simply on the wire intercepts, we observe that Klemick's review of these conversations was hardly that of an average person. To highlight this very fact for the jury, the government specifically elicited that Klemick had reviewed thousands of intercepted conversations in the course of various narcotics investigations, *see id.* at 99, and that he had had the benefit of cooperating witnesses' insights on some of these occasions, *see id.* at 100. Based on this experience, certainly outside the ken of the average person, Klemick informed the jury that he did not expect to overhear explicit references to drugs on the intercepted tapes; his experience taught him that drug dealers generally used code words when referring to their illicit transactions. *See id.* at 101. Such expert testimony is permissible "to explain both the operations of drug dealers and the meaning of coded conversations about drugs." *United States v. Dukagjini,* 326 F.3d at 52 (citing *United States v. Garcia,* 291 F.3d 127, 139 (2d Cir.2002)). Further, based on his "training and experience," Klemick knew that when targets discussed kilogram quantities of drugs, that meant they were likely acquiring drugs for distribution rather than personal use. Trial Tr. at 101; *see generally United States v. Tapia–Ortiz,* 23 F.3d 738, 741 (2d Cir.1994) (approving expert testimony as to weight, purity, dosage, and price of narcotics). When he overheard references to dollar amounts, he could assess their significance in light of his specialized knowledge that the price for a kilogram of cocaine in the New York market at the relevant time was $20,000 to $30,000. *See* Trial Tr. at 102; *see generally United States v. Quiroz,* 13 F.3d 505, 514 (2d Cir.1993) ("Matters such as the price of a kilogram of cocaine in New York City … are appropriate areas for [expert] testimony."). Training and experience had further taught him that quality could affect where within this range cocaine was priced, as could the number of middlemen in the distribution chain between the foreign supplier and the New York purchaser. *See* Trial Tr. at 102.[10]

In sum, when Klemick concluded from wiretaps, database information, and surveillance observations, that Garcia was a "partner" with Valentin in receiving cocaine from DeArmas, and that his respon-

---

**10.** Although Agent Klemick was not specifically qualified as an expert in narcotics trafficking, no objection was raised to him testifying to the general use of drug codes or the significance of certain drug quantities and prices, likely because neither the agent's expertise in this area nor his conclusions were in dispute.

sibilities included testing the quality of the cocaine, his reasoning process was not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking. *See United States v. Figueroa–Lopez*, 125 F.3d 1241, 1246 (9th Cir.1997) (distinguishing, even before 2000 amendment to Rule 701, between agent opinion properly viewed as expert testimony, i.e., that defendant's conduct was consistent with drug trafficking, and agent opinion that could be viewed as lay testimony, i.e., characterization of defendant's movements as "suspicious"). As such, his opinion testimony was not admissible under Rule 701. The government was obliged to demonstrate its admissibility under Rule 702 or forego its use.

### 3. *The Admission of Klemick's Challenged Opinion Testimony Was Harmless*

 Although Klemick's challenged opinion testimony was inadmissible under Rule 701, we conclude that this single evidentiary error had no "substantial and injurious effect or influence" on the jury verdict and, thus, was harmless. *United States v. Dukagjini*, 326 F.3d at 62 (and cases cited therein).[11] We recently distilled from relevant Supreme Court precedent the following factors relevant to harmless error review of inadmissible evidence:

(1) the overall strength of the prosecution's case;

(2) the prosecutor's conduct with respect to the improperly admitted evidence;

(3) the importance of the wrongly admitted testimony; and

(4) whether such evidence was cumulative of other properly admitted evidence.

*Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir.2004); *see also Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir.2000) ("In our assessment of whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, the principal factors to be considered are the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case."). Here, all four factors support the conclusion that the erroneous admission of Klemick's opinion testimony as to Garcia's culpability was harmless.

We begin with the second and third factors, which we consider together. For reasons already discussed in explaining why Klemick's opinion testimony was not admissible, we recognize the potential importance of having a case agent ascribe a culpable role to a defendant on trial. In this case, however, that harmful potential was minimized by the fact that the prosecution, after eliciting the opinion, never referenced it again throughout the case. Specifically, it did not mention, much less make improper use of, Klemick's challenged opinion in summation. Instead, in urging a guilty verdict, the prosecution focused the jury's attention only on the extensive admissible evidence supporting that result. Thus, in this case, both the

---

11. Garcia submits that the admission of Klemick's overview testimony was a "structural error." Appellant Garcia's Br. at 21. He is wrong. The erroneous admission of evidence is not a structural error, because " 'evidence, ... unlike the presence of counsel, is not a factor that goes to the very heart—the integrity—of the adversary process.' " *Wray v. Johnson*, 202 F.3d 515, 525 (2d Cir.2000) (quoting *Watkins v. Sowders*, 449 U.S. 341, 348, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981)). Therefore, reversal is not automatic, and we may properly consider whether the error can be deemed harmless.

second and third factors support a conclusion of harmless error.

Our conclusion is further compelled by the first and fourth factors, which we also review together. As our discussion of the facts demonstrates, the admissible evidence of Garcia's guilt was overwhelming. Alejandro Tejada, an admitted member of the cocaine conspiracy, provided direct, detailed evidence implicating Garcia in the charged crimes. *Cf. United States v. Grinage*, 390 F.3d at 751 (explaining that wrongful admission of Rule 701 evidence was not harmless where, *inter alia*, neither cooperator nor any confederate specifically implicated defendant in charged conspiracy). Tejada testified to the close partnership relationship shared by Valentin and Garcia throughout the time he delivered money and kilogram quantities of drugs at their behest. Indeed, the men worked so closely together that Tejada could not always recall which of the partners gave him instructions with respect to a particular delivery, although he was certain each did on numerous occasions. Moreover, Tejada testified that Garcia always inspected any acquired drugs to ensure their quality. Klemick's inadmissible opinion as to Garcia's role may thus be viewed as merely cumulative of Tejada's direct testimony.

In urging a contrary conclusion, Garcia argues that Klemick's opinion improperly bolstered Tejada's credibility. That concern would warrant our attention had the government ever used Klemick's testimony for this purpose in its summation but, as already noted, the government made no reference whatsoever to Klemick's opinion after eliciting it. In any event, Garcia's challenge to Tejada's credibility, based largely on the argument that Tejada's cooperation agreement and sentencing exposure gave him a motive falsely to implicate Garcia, must be viewed as relatively weak in light of the substantial corroboration provided by the intercepted telephone conversations,[12] surveillance evidence, and seizures of drugs, money, and records. *See generally United States v. Garcia–Morales*, 382 F.3d 12, 18 (1st Cir.2004) (holding improper admission of a gent overview testimony harmless because, *inter alia*, "defense was relatively weak, consisting entirely of cross-examination of the prosecution's witnesses to challenge their credibility").

Particularly incriminating was a conversation recorded on the night of an anticipated drug exchange in which Garcia is overheard actually opening a package—confirmed by Tejada's testimony and the subsequent seizure to be cocaine—and pronouncing its quality unsatisfactory. Similarly self-inculpatory was Garcia's ensuing conversation with DeArmas arranging for Tejada to return the inferior drugs on the very day that agents arrested Tejada in possession of ten kilograms of cocaine, followed later that evening by Garcia's recorded expression of concern that the planned delivery had not taken place as scheduled. Garcia's guilt was further convincingly demonstrated by his recorded discussions with Valentin of their $81,000 indebtedness to DeArmas and a proposed preliminary payment of $9,000, both of which were corroborated by seizures of money and records from Garcia's van following the three men's arrests.

In sum, the totality of the admissible evidence so strongly established Garcia's

---

12. Significantly, Garcia raises no Rule 701 challenge to the agents' testimony with respect to these conversations. *Cf. United States v. Grinage*, 390 F.3d at 750–51 (finding that error in admission of agent's purported lay opinions as to meaning of wire intercepts was not harmless because almost no other evidence implicated defendant in charged crime).

partnership role in the charged conspiracy that we can confidently conclude that Klemick's opinion of culpability had no substantial effect on the jury verdict of guilty. Thus, we deem the evidentiary error harmless and decline to reverse Garcia's conviction. *See United States v. Casas*, 356 F.3d at 122 (concluding that case agent's inadmissible characterization of defendant's role in criminal scheme was harmless because jury would have reached "same determination ... in the absence of the inadmissible testimony"); *see also United States v. Garcia–Morales*, 382 F.3d at 18 (concluding that erroneous admission of overview evidence was harmless because case agent's conclusion that defendant was drug distributor was later corroborated by overwhelming evidence).

B. *Although Defendants' Cases Must Be Remanded for Further Sentencing Proceedings in Light of Booker and Crosby, Defendants' Claim that Their Guidelines Calculations Are Not Supported by Even a Preponderance of the Evidence Is Without Merit*

In appealing their incarceratory sentences, Garcia and Valentin both submit that the district court's findings of fact in calculating their Sentencing Guidelines ranges were not supported by a preponderance of the evidence.[13] Moreover, defendants assert that *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, invalidates judicial fact-finding in the calculation of Guidelines ranges. They contend that the Sixth Amendment right to trial by jury requires facts triggering particular sentencing ranges to be proved beyond a reasonable doubt to a jury or specifically admitted by the defendant.

After *United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621, we agree with defendants that there was a Sixth Amendment error in the calculation of their Guidelines ranges but, because this issue was not raised below, our review is limited to plain error. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (identifying four factors relevant to plain error analysis: there must be error; the error must be plain; the error must affect substantial rights; and it must seriously affect the fairness, integrity, or public reputation of judicial proceedings); *accord United*

**13.** Garcia, who preserved this claim below, presents it directly on appeal. Valentin, on the other hand, presents the claim indirectly, arguing that his former counsel's failure to challenge the sufficiency of the evidence supporting various Guidelines calculations constituted constitutionally ineffective representation.

As a general rule, we will not entertain ineffective assistance claims on direct appeal, *see Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003) (cautioning that such challenges are better raised under 28 U.S.C. § 2255), unless "the factual record is fully developed and resolution of the Sixth Amendment claim ... is beyond any doubt," *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir.2004) (internal quotation marks omitted). This is such a case. A defendant raising an ineffective assistance claim must satisfy both parts of the test articulated in *Strickland v. Washington*, i.e., he must demonstrate (1) that counsel's representation "fell below an objective standard of reasonableness," and (2) that "but for counsel's unprofessional errors,the result of the proceeding would have been different." 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is "no doubt" that Valentin cannot satisfy the prejudice prong of this test because the record plainly supports the district court's findings of fact relevant to the calculation of defendants' Guidelines ranges. Accordingly, as discussed *infra,* we reject defendants' preponderance challenges as without merit, whether presented directly or as an ineffective assistance claim.

*States v. Cotton,* 535 U.S. 625, 631–32, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002); *see also* Fed.R.Crim.P. 52(b). Since *Booker,* our court has recognized that the mandatory application of federal Sentencing Guidelines enhancements constitutes error that is plain, thus satisfying the first two prongs of the *Olano* test. *See United States v. Williams,* 399 F.3d at 460; *United States v. Crosby,* 397 F.3d at 118–19. But the third and fourth prongs of plain error analysis, i.e., an effect both on substantial rights and on the fairness, integrity, or public reputation of judicial proceedings, are not so easily determined with respect to pre-*Booker* sentences. Mindful that an error "must have affected the outcome" of the proceeding to implicate substantial rights, *United States v. Olano,* 507 U.S. at 734, 113 S.Ct. 1770, we concluded in *Crosby* that the final two *Olano* factors required a finding of material difference between the sentence imposed prior to *Booker* and the sentence that would have been imposed with a correct understanding of federal sentencing law as now explained by the Supreme Court, *see United States v. Crosby,* 397 F.3d at 118 ("[A] sentence imposed under a mistaken perception of the requirements of law will satisfy plain error analysis if the sentence imposed under a correct understanding would have been materially different."). Because *Crosby* concluded that an appellate court could not make this determination simply on the record of the initial sentencing, it ordered the case remanded to the district court for further proceedings. Specifically, it concluded that, "[i]f a district court determines that a nontrivially different sentence would have been imposed, that determination completes the demonstration that the plain error test is met." *Id.; see United States v. Williams,* 399 F.3d at 460–61 (explaining how *Crosby* remand comports with plain error review). We similarly remand this case for further proceedings consistent with *Crosby.*

◼ We write simply to explain why we follow that practice in this case, even though the death of the original sentencing judge will necessarily require reassignment of the case on remand to a different district judge.[14] Further, to facilitate the district court's task on remand, we specifically reject defendants' argument that the district court's sentencing findings were not supported by even a preponderance of the evidence.[15] *See United States v. Rubenstein,* 403 F.3d 93, 98–99 & n. 1 (2d Cir.2005).

 1. *A Preponderance of the Evidence Supports the District Court's Guidelines Calculations*

 a. *The Guidelines as Applied to Defendants*

The jury verdict against Garcia expressly found, and Valentin in his plea allocution

---

14. The Honorable Robert J. Ward, who for more than thirty years served with distinction on the United States District Court for the Southern District of New York, died on August 5, 2003.

15. Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives *Booker.* As we explained in *Crosby,* after *Booker,* district courts are still statutorily obliged to "consider" the Guidelines, 397 F.3d at 111 (quoting 18 U.S.C. § 3553(a)(4)), which necessarily means they must determine the Guidelines range applicable to a particular defendant, *id.* This task is to be performed "in the same manner as before *Booker* [ ]," *id.* at 112, because "with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection. Thus, the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* (footnote omitted).

specifically admitted, that the defendants had conspired to traffic in five or more kilograms of cocaine, exposing each man to a statutory sentencing range of ten years to life in prison pursuant to 21 U.S.C. § 841(b)(1)(A). In calculating the Sentencing Guidelines to determine where within this statutory range the defendants should be sentenced, the district court concluded that each man's base offense level was 38 because a preponderance of the evidence demonstrated that their conspiracy had dealt in more than 150 kilograms of cocaine. *See* U.S.S.G. § 2D1.1(c)(1). It further concluded that each man merited a two-level enhancement for supervisory role because the partners were equally responsible for directing the activities of their co-conspirator Tejada. *See id.* § 3B1.1(c).

Relying on a total offense level of 40 and a criminal history category of I, the district court calculated Garcia's Guidelines sentencing range at 292 to 365 months. Rejecting a downward departure motion based on extraordinary family circumstances, the court sentenced Garcia to concurrent 292–month prison terms, representing the low end of his sentencing range. Because the court awarded Valentin three levels' consideration for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, it calculated his total offense level at 37, which, with a criminal history category of I, resulted in a Guidelines range of 210 to 262 months. Rejecting a suggestion that the conditions of Valentin's pre-sentence confinement might warrant a downward departure, the district court sentenced Valentin to concurrent terms of 210–months' incarceration, the low end of his Guidelines range.

### b. *The Standard of Review*

We have long reviewed a district court's findings of fact as they apply to sentencing enhancements only for clear error. *See*

*United States v. Franklyn,* 157 F.3d 90, 97 (2d Cir.1998); *see also United States v. Greer,* 285 F.3d 158, 181–82 (2d Cir.2002); *United States v. Napoli,* 179 F.3d 1, 15 (2d Cir.1999). This standard of review had found statutory support in 18 U.S.C. § 3742(e), which stated, in relevant part, that "[t]he court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous." In *United States v. Booker,* however, the Supreme Court "severed and excised" § 3742(e) from federal sentencing law. 125 S.Ct. at 756–57. Although *Booker*'s concern focuses not on the above-quoted language but rather on modifications to the statutory text in 2003 that added "a *de novo* standard of review for departures," *id.* at 765 (citing Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub.L. 108–21, § 401(d)(1), 117 Stat. 650, 670), its excision appears to preclude further reliance on any part of § 3742(e) or our pre-*Booker* precedents that cited to that section.

 Even where no statute addresses the standard of review, the Supreme Court has approved the clearly erroneous standard for findings of fact in criminal cases on issues other than those that determine guilt. *See Hernandez v. New York,* 500 U.S. 352, 365–66, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (noting that, while "the precise formula used for review of factfindings ... depends on the context," "Federal Rule of Civil Procedure 52(a) ... permits factual findings to be set aside only if clearly erroneous" and "the same standard should apply to review of findings in criminal cases on issues other than guilt") (citing *Maine v. Taylor,* 477 U.S. 131, 145, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986); *Campbell v. United States,* 373 U.S. 487, 493, 83

S.Ct. 1356, 10 L.Ed.2d 501 (1963)). Thus, even after *Booker*'s excision of § 3742(e), it is appropriate to maintain a clear error standard of review for appellate challenges to judicial fact-finding at sentencing. *See United States v. Selioutsky*, 409 F.3d 114, 119 (2d Cir.2005) (recognizing that, after excision of § 3742(e), court continues to review issues of fact for clear error).

This is true notwithstanding the Supreme Court's articulation in *Booker* of a reasonableness standard of review for federal sentences challenged on direct appeal. *See United States v. Booker*, 125 S.Ct. at 765. Even prior to *Booker*, our reasonableness review of certain discrete sentencing decisions was inextricably linked to clear error review of the findings of fact supporting the district court's reasons for imposing the particular sentence. *See United States v. Khalil*, 214 F.3d 111, 124 (2d Cir.2000). Indeed, in a variety of contexts in which we deferentially review district court action for abuse of discretion, we apply clear error review to the underlying findings of fact. *See, e.g., Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir.2003) (reviewing contempt order for abuse of discretion and underlying findings of fact for clear error); *United States v. Juncal*, 245 F.3d 166, 170–71 (2d Cir.2001) (reviewing denial of motion to withdraw guilty plea for abuse of discretion and findings of fact in connection with that decision for clear error); *Friends of Animals Inc. v. United States Surgical Corp.*, 131 F.3d 332, 334 (2d Cir.1997) (reviewing dismissal sanctions for abuse of discretion and supporting factual findings for clear error).

■ Of course, our present task is not to review the defendants' sentences for reasonableness. Under the framework established by *Crosby*, that inquiry arises after the district court either has determined that the defendant does not need to be resentenced or has imposed a new sentence. We are not yet at that stage. At present, we consider whether the district court's findings of fact were clearly erroneous because the district court, on remand, remains under an obligation to consider the Guidelines, and our resolution of defendants' Guidelines objections "will assist the district court in fulfilling that obligation." *United States v. Maloney*, 406 F.3d 149, 152 (2d Cir.2005).

■ To reject a finding of fact as clearly erroneous, we must, upon review of the entire record, be "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. Sash*, 396 F.3d 515, 521 (2d Cir. 2005).[16] That is not this case.

c. *The Drug Quantity Calculation*

■ Valentin's contention that a preponderance of the evidence did not support the district court's finding as to drug quantity is plainly belied by the record. Tejada testified that on fifteen to twenty occasions between the summer of 2001 and March 2002, he transported cocaine for the defendants in amounts ranging from ten to forty kilograms per trip, with one particularly large transport involving seventy kilograms of cocaine. As the district court observed in crediting this testimony, even if only ten of Tejada's transports had involved ten kilograms of cocaine and one transport had involved seventy kilograms, that by itself would yield a total drug

**16.** Where a defendant asserts that a district court's factual findings cannot, as a matter of law, support a particular Guidelines enhancement, we conduct *de novo* review of that legal question. *See United States v. Sash*, 396 F.3d at 520; *United States v. Escotto*, 121 F.3d 81, 85 (2d Cir.1997). No such legal issue, however, is presented in this case.

quantity of 170 kilograms, more than sufficient to apply a base offense level of 38 to defendants' Guidelines calculations. *See* U.S.S.G. § 2D1.1(c)(1) (identifying level 38 for drug crimes involving 150 kilograms or more of cocaine). In fact, Tejada's testimony was corroborated by drug records seized from the defendants at the time of their arrest, which indicated their acquisition of approximately 235 kilograms of cocaine.

Accordingly, Valentin's preponderance challenge to the drug quantity calculation is without merit.

### d. *The Defendants' Role Enhancements*

Both defendants submit that a preponderance of the evidence did not support the district court's finding that they merited supervisory enhancements to their Guidelines ranges pursuant to U.S.S.G. § 3B1.1(c). They are wrong.

▇▇▇▇ Section 3B1.1(c) provides for a two-level enhancement if a defendant's role in the offense of conviction was that of "an organizer, leader, manager, or supervisor." As this court has repeatedly recognized, "[a] defendant may properly be considered a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense ... or played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Burgos,* 324 F.3d 88, 92 (2d Cir.2003) (internal quotation marks omitted). Moreover, a defendant need only manage or supervise "a single other participant" to warrant a § 3B1.1(c) enhancement. *Id.* In this case, the district court concluded that Garcia and Valentin each warranted a two-level enhancement because they both supervised Tejada.

Both direct and circumstantial evidence supported the district court's findings as to defendants' roles. Tejada testified that it was Valentin who recruited him as a drug courier for the conspiracy, conduct that, by itself, could support Valentin's § 3B1.1(c) enhancement. *See United States v. Greenfield,* 44 F.3d 1141, 1147 (2d Cir.1995) (considering recruitment of confederate as evidence of supervisory role under § 3B1.1). In fact, Valentin's supervisory role was not limited to Tejada's recruitment. Tejada made plain that, on the numerous occasions when he transported drugs for the conspiracy, he was following directions provided by both Garcia and Valentin. To the extent Tejada could not always recall which partner instructed him as to a particular drug transport, he explained that "the two were always with me to tell me what I had to do." Trial Tr. at 215. In the end, Tejada made clear that *each* defendant was involved in supervising his drug activities:

Q: Were there times when Yuri Garcia provided you with direction about where to take the cocaine to?

A: Many times.

Q: And were there times when Francisco Valentin instructed you where to take the cocaine to?

A: Yes.

*Id.* Similarly, *each* defendant supervised Tejada's transportation of drug proceeds:

Q: And who provided you with your instructions regarding the collection of these payments?

A: Well, it was either Francisco or Yuri.

Q: Were there occasions when it was Francisco Valentin?

A: Yes.

Q: And were there occasions when it was Yuri Garcia?

A: Yes.

*Id.* at 220.

■ Garcia submits that he and Tejada were Valentin's subordinates in the charged conspiracy. This leaves open, however, the question of whether Garcia nevertheless supervised Tejada. As we have previously recognized, more than one person at more than one level of a conspiracy may act as a supervisor. *See United States v. Si Lu Tian,* 339 F.3d 143, 157 (2d Cir.2003). In any event, Garcia's efforts to minimize his role in the conspiracy are not supported by the record. In addition to testifying that Garcia frequently instructed him as to drug transport, Tejada specifically testified that Garcia supervised the operation's finances: "He [Garcia] was the one that said this money is for this one, this money is for that one, and he is the one who paid us." Trial Tr. at 220. This testimony was, moreover, corroborated by wire intercepts and the seizure of papers at the time of defendants' arrests indicating Garcia's management of the partnership's finances. The wire intercepts further revealed that Garcia took the lead in orchestrating the return of the unsatisfactory ten-kilogram shipment of cocaine to DeArmas, specifically directing and supervising Tejada's transport of these drugs.

For all these reasons, we conclude that there is no merit to defendants' preponderance challenge to the district court's findings as to role.

### 2. The Crosby Remand in This Case

#### a. Crosby's Method for Conclusively Resolving the Final Two Prongs of Plain Error Review

■ In *United States v. Crosby,* 397 F.3d at 117–18, this court concluded that plain error review of a pre-*Booker* sentence ultimately turns on a single question: whether the challenged sentence is materially different from the one that the district court would have imposed with a correct understanding of federal sentencing law as now explained by the Supreme Court. *Crosby* acknowledged that an appellate court would normally not be able to answer this question. *See id.* Nevertheless, it specifically rejected the conclusion that this inability limited its choices to "disregarding the error" or "requiring a new sentencing." *Id.* at 117; *accord United States v. Williams,* 399 F.3d at 457–60 (discussing reasons for rejecting routine affirmances or routine remands for resentencing in response to unpreserved Sixth Amendment challenges). Instead, *Crosby* identified a third option for more precisely determining whether the sentencing error affected a defendant's substantial rights: a remand of the comparative sentence inquiry to the district court. As *Crosby* explained:

> the errors in the procedure for selecting the original sentence discussed in this opinion would be harmless, and not prejudicial under plain error analysis, if the [district] judge decides on remand, in full compliance with now applicable requirements, that under the post-*Booker/Fanfan* regime the sentence would have been essentially the same as originally imposed. Conversely, a district judge's decision that the original sentence would have differed in a nontrivial manner from that imposed will demonstrate that the error in imposing the original sentence was harmful and satisfies plain error analysis.

*Id.* at 118; *accord United States v. Williams,* 399 F.3d at 461.[17]

---

17. In reaffirming *Crosby*'s remand procedure, *Williams* detailed how this process permits an appellate court to resolve the third and fourth prongs of plain error analysis:

*Crosby's* approach to plain error review, now commonly referred to as a *"Crosby* remand," permits this court to resolve the final two *Olano* factors without regard to whether the burden of persuasion rests with the defendant under traditional plain error review, *see United States v. Williams,* 399 F.3d at 458, or shifts to the government under our modified plain error standard, *see United States v. Viola,* 35 F.3d 37, 43 (2d Cir.1994). To explain, if the effect of an unpreserved *Booker* error were to remain indeterminate, an appellate court's plain error analysis would necessarily turn on the burdens of persuasion assigned by the two possible standards of review. Under traditional review, we would likely "disregard[ ]" a *Booker* error, *United States v. Crosby,* 397 F.3d at 117, because the defendant would not be able to demonstrate simply on the appellate record a clear and convincing likelihood of a material sentencing discrepancy. On the other hand, under our modified plain error review, we would likely "requir[e] a new sentencing," *id.,* because the same record would not permit the government clearly and convincingly to demonstrate only a

trivial discrepancy in sentencing. Precisely because many unpreserved trial errors must, of necessity, be indeterminate, the assignment of the burden of persuasion becomes the "tie-breaker," and, thus, the choice of the review standard determinative. *See, e.g., Jones v. United States,* 527 U.S. 373, 395, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (finding no effect on "substantial rights" where allegedly erroneous jury instruction had "an indeterminate effect on the outcome of the proceeding"); *United States v. Viola,* 35 F.3d at 43 (concluding, based on modified plain error review, that instruction regarding participation in RICO enterprise did affect substantial rights).

As *Crosby* recognized, however, the effect of a plain *Booker* error need not remain indeterminate because "[w]e can ask the sentencing judge" what effect, if any, the error had on sentence. *United States v. Williams,* 399 F.3d at 459. Once the effect on substantial rights is known, this court's grant or denial of plain error relief is the same regardless of which party bears the burden of persuasion. If the district court identifies a nontrivial differ-

---

[O]ur remand demonstrated our decision that the view of the sentencing judge as to whether the sentence would have been materially different would establish to our satisfaction that the third *Olano* prong was met, or as we put it, would "complete[ ]" the plain error analysis. *See Crosby,* 397 F.3d at 118. The remand also implicitly indicated our view that the sentencing judge's conclusion that a materially different sentence would have been imposed would establish to our satisfaction that the fourth *Olano* prong was met, since leaving in place an error-infected sentence that would have been materially different absent error and that could be readily corrected would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 736, 113 S.Ct. 1770 (internal quotation marks omitted). *United States v. Williams,* 399 F.3d at 461. *Williams* further explained:

We could have required the case to be restored to our jurisdiction immediately after the district court decided whether the original sentence would have been materially different, and then affirmed whenever the district judge's answer was "no" or remanded for resentencing whenever the district judge's answer was "yes." That procedure would have precipitated needless yo-yoing between the appellate court and the district court simply to enable the appellate court to announce the outcome of applying the third and fourth *Olano* factors in each case. It was more efficient to announce ahead of time that if the district judge's answer was "yes," that decision would, in our assessment, satisfy the third and fourth *Olano* factors. *Id.* at 461 n. 15.

ence in sentence, then the defendant is entitled to resentencing, even under traditional review. But if the district court identifies only a trivial sentencing discrepancy, then no resentencing is called for, even under our modified analysis. In sum, among *Crosby*'s many benefits, its remand procedure permits this court to resolve *Booker* plain error challenges without having to decide the open question whether our modified plain error standard survives the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). *See United States v. Williams*, 399 F.3d at 458 n. 7 (noting that "[w]e have recognized, but not resolved, the issue of whether this modified plain error doctrine has been rejected by *Johnson* ").

In this case, no less than in *Crosby*, plain error analysis depends on the identification of a material difference between the defendants' challenged sentences and those that would have been imposed with the benefit of *Booker*. As in *Crosby*, this court cannot confidently resolve this issue on the record before us because "as a reviewing court we do not know what the sentence would have been absent the error." *Id.* at 458. Accordingly, a *Crosby* remand for a conclusive comparative sentence inquiry appears warranted. The question we confront is whether such a remand should be ordered where, as in this case, the original sentencing judge is no longer available to make the necessary comparison. Because we conclude that the sentencing comparison identified by *Crosby* as determinative of plain error can reliably be performed by a district judge other than the one who imposed the original sentence, we hold that a *Crosby* remand is appropriate in this case.

b. *Ordering Crosby Remands in Cases Where the Original Sentencing Judge Is No Longer Available*

We preliminarily acknowledge that, in *United States v. Williams*, this court alluded to the availability of the "sentencing judge" as pertinent to *Crosby*'s remand procedure: "the availability of the sentencing judge to advise us made it appropriate to learn authoritatively what would have happened, absent error, rather than make a wrong guess or place on the defendant the risk of serving extra years because he could not prove what the right guess should be." *Id.* at 460–61; *see also id.* at 459 (rejecting suggestion that appellate court would have to speculate to determine what sentence would have been imposed absent Sixth Amendment error: "We can ask the sentencing judge."). We do not, however, construe this language to hold that *Crosby* remands are warranted *only* when further proceedings in the district court will be handled by the original sentencing judge. Rather, the quoted language simply recognizes the practical reality that most *Crosby* remands, including those in *Crosby* and *Williams*, will likely be addressed by the original sentencing judge.[18] *Crosby*, however, made plain that it is the District Court as an institution—not simply an individual judge of that court—that is better suited than the Court of Appeals to perform the comparative sentence inquiry necessary to "complete[ ]" plain error review. *United States v. Williams*, 399 F.3d at 461 (quoting *United States v. Crosby*, 397 F.3d at 118 (explaining how district court's comparative sentence inquiry permits appellate

---

**18.** The division of business among judges on a particular district court is a matter generally addressed by local rule. *See* 18 U.S.C. § 137.

court to "complete" plain error review)). Two reasons informed this conclusion.

First, comparative sentence review will frequently require expansion of the record, so that the parties can present "aggravating" and "mitigating circumstances that existed at the time [of the original sentence] but were not available for consideration under the mandatory Guidelines regime." *United States v. Crosby*, 397 F.3d at 118. A district court can develop such a record and, where necessary, conduct hearings to resolve factual disputes; an appellate court cannot. *See id.* at 120. As *Williams* explained:

> An appellate court, confined to the record of the prior sentencing, would often have difficulty if it tried to estimate whether the district court, absent a sentencing error, would have imposed a materially different sentence. The question can be better answered on a remand, at which the district court would be able to receive and evaluate submissions from the parties of circumstances, existing at the time of the original sentencing, that might have materially altered the original sentence had the Guidelines only been advisory.

*United States v. Williams*, 399 F.3d at 459 n. 8.

Undoubtedly, the original sentencing judge, already familiar with the case, can most efficiently supervise any record expansion necessary to comparative sentence analysis. But the task of record development is so fundamental to the work of the district court that it certainly falls within the capability of any district judge who becomes familiar with the prior record. In sum, because an expanded record of the circumstances existing at the time of the original sentencing may well be critical to a reliable comparative sentence assessment, this factor weighs heavily in favor of *Crosby* remands even when the unavailability of the original sentencing judge requires reassignment of the case to another district judge.

Second, *Crosby* recognized that district judges' familiarity with the sentencing process is necessarily more extensive and direct than that of appellate judges. *See United States v. Crosby*, 397 F.3d at 113 (comparing the "day-to-day role of district justices in imposing sentences" with "the episodic role of appellate judges in reviewing sentences"). An appellate court may review a sentence and even reverse it, but it cannot itself impose sentence. That responsibility, which belongs exclusively to the district court, has been described as its "most important function." Charles E. Wyzanski, Jr., *A Trial Judge's Freedom and Responsibility*, 65 Harv. L.Rev. 1281, 1291 (1952). Because an appellate court does not itself impose sentence, it can only "make an educated guess" as to what sentence a *district court* would have imposed with the benefit of *Booker* (particularly in a case requiring further development of the record). *United States v. Crosby*, 397 F.3d at 118. District courts, however, do not need to guess. On a *Crosby* remand, a district judge can draw on extensive, direct sentencing experience to determine whether the sentence that the court would have imposed with the benefit of *Booker* materially differs from the challenged sentence.

█ Here again, we recognize that the original sentencing judge's familiarity with a case would allow him or her to make this comparative assessment most easily and reliably. But where that judge is no longer available, the district court's ability to provide a reliable response to a *Crosby* remand does not abruptly cease. The judgment appealed from, after all, is that of the district court, not simply that of a particular judge. Thus, the comparative sentence inquiry might properly be viewed as between the court's challenged sentence

and the sentence *the court* would have imposed with a proper understanding of the law. Where the original sentencing judge is no longer available to speak for the district court on the second point, the responsibility for identifying the sentence that the court would have imposed under a correct view of the law may properly be reassigned to another district judge. Such reassignment comports with the general provision of Rule 25 providing that, "[a]fter a verdict or finding of guilty, any judge regularly sitting in or assigned to a court may complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability." Fed. R.Crim.P. 25(b)(1); *cf.* Fed.R.Civ.P. 63. Just as a successor judge may sentence following a trial over which another judge presided or pursuant to a guilty plea that another judge accepted, *see* 25 *Moore's Federal Practice—Criminal Procedure* § 625.06[1]-[3] (3d ed.2004); *see also United States v. Colon–Munoz*, 292 F.3d 18, 22 (1st Cir.2002) (holding that defendant cannot challenge process that led to sentencing before different judge from one who presided over his trial), so too a successor judge may properly consider whether to resentence following a *Crosby* remand.

This is not to suggest that district judges are " 'fungible' "; they certainly are not. *See Laird v. Tatum*, 409 U.S. 824, 834, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972)

(quoting *Chandler v. Judicial Council*, 398 U.S. 74, 137, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (Douglas, J., dissenting)). But the fact that all district judges possess direct sentencing experience, considered together with their ability to develop factual records, necessarily means that such judges can reliably determine, even on reassignment, whether there is a nontrivial difference between a challenged original sentence and one that would have been imposed with a correct understanding of the law.

It may be useful to note that in making this determination, we do not expect a successor judge to do the impossible, i.e., determine what sentence the original judge would have imposed on behalf of the court with a correct understanding of the law and a fully developed record. Instead, on reassignment, a district judge should consider what sentence *he* or *she* would have imposed on behalf of the court with the benefit of *Booker* and a full record.[19] The judge must then determine whether that lawful sentence differs in a more than trivial manner from the one that was actually imposed. In *Crosby*, 397 F.3d at 118 n. 20, we ruled that a district judge need not precisely determine what sentence would have been imposed under a correct view of the law; a judge need only decide whether there would have been a more than trivial difference between that sen-

---

**19.** In reviewing the prior sentencing record, a successor judge should nevertheless carefully consider any statements made by the original sentencing judge indicating an inclination to show greater leniency or severity but for the Guidelines mandates. In this case, for example, Judge Ward stated that, although Garcia's domestic situation was sympathetic, any downward departure would be an "empty gesture" in light of circuit precedent narrowly interpreting the permissible scope of a departure for extraordinary family circumstances. Garcia Sentencing Tr. at 36. This is not to suggest that the successor judge is now bound

to resolve the *Crosby* remand in accordance with these statements. It remains impossible to discern exactly what sentence Judge Ward would have imposed had he anticipated *Booker*'s transformation of the Guidelines from mandatory to advisory with a continuing obligation to "consider" the Guidelines and their policy statements. 18 U.S.C. § 3553(a)(4)-(5). Rather, the successor judge should consider Judge Ward's observations together with all other relevant factors and then decide what sentence the successor judge would have imposed with the benefit of *Booker* and a fully developed record.

tence and the one that the judge in fact imposed. Where a *Crosby* remand is reassigned to a judge who did not impose the challenged sentence, however, the necessary comparative assessment is most clearly made if the new judge states whether the sentence that judge would have imposed with the benefit of *Booker* is or is not the same as the challenged sentence.

It is, of course, impossible to know whether a successor judge's comparative sentence analysis will be identical in all respects to that which the original sentencing judge would have reached, were he available. That, however, is no reason to abandon *Crosby* remands in cases requiring reassignment. As already noted, the comparative analysis necessary to determine whether a defendant's substantial rights have been affected by a sentence imposed in violation of the Sixth Amendment is between two sentences of the district court, and that court can reliably respond to that inquiry through the voice of more than one judge. A defendant who asserts plain error in a pre-*Booker* sentence is certainly entitled to have a competent judge, familiar with his case, determine if the error affected substantial rights. But he cannot demand that only a "particular judge ... act[ ] for the court." *United States v. Colon–Munoz*, 292 F.3d at 22. We order a *Crosby* remand in this case despite the unavailability of the original sentencing judge because we conclude that any district judge to whom the case is reassigned will possess sufficient direct sentencing experience and ability to review and develop the record to permit that judge reliably to identify a nontrivial difference between defendants' challenged sentences and those that would have been imposed by the court under federal sentencing law as now explained by the Supreme Court.

Our concurring colleague does not share our confidence in the ability of a successor judge reliably to respond to a *Crosby* inquiry. Accordingly, he dismisses the analysis prompting our *Crosby* remand in this case as *dicta*. He explains that he nevertheless joins in the judgment only because he expects the remand in this case to be "identical, in its effects," to resentencing. *Infra* at 231. He further attempts to reserve for a "later panel" the question whether plain error analysis, in fact, requires a new sentence. *Id.* at 232 & n. 2. Because we owe a duty to district courts and the parties to make our rulings as clear as possible, we here state that it is *not* the opinion of this court that a *Crosby* remand assigned to a new judge must, "in effect," be a resentencing. To the contrary, by ordering a *Crosby* remand, we specifically hold that no resentencing is necessary if the district court, in response to our comparative sentencing inquiry, reports no non-trivial sentencing discrepancy. *See United States v. Crosby*, 397 F.3d at 118. As we have previously ruled, that comparative inquiry must be made by reference to the facts "existing at the time of the original sentencing," *United States v. Williams*, 399 F.3d at 459 n. 8; we do not expect district courts to consider new evidence arising after that time, as would be the case if a *Crosby* remand were a resentencing. In short, we do not today leave unresolved the question whether on remand a successor judge is imposing a new sentence or only re-confirming the original one. *See infra* at 232. We hold that the sentencing comparison that is the essence of a *Crosby* remand is *not* a resentencing and need not attempt to mimic one, regardless of whether the necessary determination is made by the original sentencing judge or a successor judge to whom the case is reassigned. Only if the district judge identifies a more-than-trivial disparity between the challenged sentence and

the sentence that the court would have imposed with the benefit of *Booker* does the judge proceed to resentence a defendant.

As we discussed earlier, *supra* at 225–26, because a *Crosby* remand ensures that the effect of a *Booker* sentencing error is not indeterminate, we avoid the need to resolve defendants' plain error challenge by reference to the burdens of persuasion assigned by traditional and modified standards of review. Thus, once we hold, as we do today, that a successor judge can reliably respond to *Crosby*'s comparative sentencing inquiry, there is no more need for us to reference the burdens of persuasion assigned by the different standards of plain error review than there is when a *Crosby* remand is handled by the original sentencing judge. In any event, we expect no "later panel" to reconsider this issue on any appeal from the remand proceedings. As we clarified in *United States v. Williams*, 399 F.3d at 460–61 & n. 15, this court "completes" its *Booker* plain error review when it orders a *Crosby* remand. Any further appeal would have to challenge the district court's fair compliance with *Crosby*, not the standards applicable to the plain error review that we here conclude.

 Having thus clarified that the *Crosby* remand ordered in this case is not a resentencing, we note that there is one respect in which the comparative sentence inquiry by a successor judge may differ from that of the original sentencing judge: while we leave it to the discretion of the latter judge whether to produce a defendant for the necessary sentencing comparison, we require a newly assigned judge to do so. We impose this requirement not because a *Crosby* remand to a new judge is effectively a resentencing, as our concurring colleague suggests, but because a newly assigned judge must become fully familiar with the prior proceedings in order to make a reliable sentencing comparison, and the judge cannot do so without actually seeing the defendant in open court and affording him an opportunity to be heard. As we know from our work as appellate judges, human insights important to sentencing cannot be gleaned simply from a review of a cold record. Further, although the production of a defendant may not be essential to the perceived integrity of a *Crosby* remand handled by the original sentencing judge, *see United States v. Crosby*, 397 F.3d at 120 (holding that defendant's presence in court is not required on remand to decide *if* resentencing is necessary), when a *Crosby* remand is reassigned to a judge who has never dealt with the defendant, both the parties' and the public's perception of the fairness of the process is enhanced by requiring that judge to have some direct contact with the defendant in a formal court proceeding before answering the remand inquiry, *see generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 78, 81–82 (1998) (noting symbolic function served by formal, public sentencing proceedings). Accordingly, where, as in this case, a *Crosby* remand will not be handled by the original sentencing judge but will, of necessity, be reassigned to another judge, that judge must order the defendant produced in open court for the *Crosby* comparative sentence inquiry and must afford him an opportunity to be heard. An exception can be made only if the defendant and the government both waive the defendant's appearance, and if the court consents to that waiver.

In sum, although a *Crosby* remand may operate less efficiently when the original sentencing judge is no longer available, we

conclude that it operates with sufficient reliability that, even in this limited category of cases, we remain committed to case-by-case review of plain error rather than wholesale assumptions that substantial rights were affected in no or all such cases. Accordingly, we order a *Crosby* remand in this case, despite the fact that the original sentencing judge is no longer available to perform the necessary sentencing comparison.

### III. *Conclusion*

To summarize, we conclude that the testimony of a government agent assigning defendant Garcia a culpable role in the charged conspiracy was not admissible as a lay summary opinion of anticipated evidence under Fed.R.Evid. 701, but that defendant is not entitled to a new trial because the error was harmless.

We further conclude that defendants' incarceratory sentences were based on Guidelines calculations that, although supported by a preponderance of the evidence, violated the Sixth Amendment right to trial by jury but that plain error review cannot be concluded without further proceedings in the district court.

Accordingly, the judgments of the district court are AFFIRMED insofar as they reflect defendants' guilt on the crimes of conviction and the calculation of their Sentencing Guidelines by a preponderance of the evidence. The judgments are REMANDED for further sentencing proceedings in conformity with this court's decision today and in *United States v. Crosby*, 397 F.3d 103.

---

1. It seems to me that—regardless of whether we describe what we are doing as a *Crosby* remand or a remand for a new sentence (which may, however, mirror the old sentence)—what we have today mandated may,

CALABRESI, Circuit Judge, concurring.

I entirely agree with the result reached by the majority, and I agree with virtually all of its reasoning (that is, all but some of the discussion in Part II.B.2(b)). I do not, however, agree with the panel's equation of a remand to a new judge—when the original sentencing judge is no longer available—to a normal *Crosby* remand. It seems to me impossible for a new judge to give the kind of assurance—that the sentence imposed originally is the one that the no-longer-available judge would have imposed after *Booker*—that we have when the original judge has reconsidered his or her pre-*Booker* sentence. Courts may all be courts, but sentencing is a matter of considerable discretion, and I simply do not understand how a different human being can say for sure that the original sentence would have been essentially the same had *Booker* already been decided.

I concur in the judgment because, *in this case*, our mandate remanding to a new judge, who is required to have the defendant appear before him or her during a *Crosby* reconsideration, is identical, in its effects, to a remand for a post-*Booker* new sentence. In other words, given the panel's requirement that the defendant be present, there is—on the facts of this case as far as we know them—no difference between what would happen were the old sentence reconfirmed or a new sentence imposed.

That being so, I do not quite understand the majority's determination to categorize what it has ordered as a *Crosby* "comparative sentencing inquiry." *Ante*, at 229.[1] My reaction, therefore, to the majority's opinion is that much in Part II.B.2(b) is

depending on the new judge's view of the case, result in an identical sentence as before, or it may not. And what we *call* our remand will make no difference to that judge's view.

dicta and unnecessary.[2] And, I believe that it will be up to a later panel—which is deciding a case in which, unlike this one, the outcome of some significant legal question turns on whether a new sentence is being imposed or an old sentence is being reconfirmed—to determine whether the thoughtful, but in my judgment incorrect, analysis of this issue by the majority of this panel will be treated as binding or not.[3]

**2.** The majority responds to my concurrence by underlining that it intends its remand—to a new judge for a "Crosby comparative sentence inquiry" in the presence of the defendant—to constitute a holding that such an inquiry is not a resentencing. And, having underlined its intention, the majority then re-emphasizes it. I do not doubt what the majority wishes to do. But calling that which is not necessary to decide the case a "holding" does not make it any less dicta. And insisting that it is a holding simply makes the dicta more emphatic.

Emphatic dicta will and should be afforded more weight by later panels than casual dicta. But especially given our circuit's long-standing practice a) of adhering strictly to holdings of prior panels, and b) of reviewing such holdings en banc only exceedingly rarely, see Jon O. Newman, *Foreword: In Banc Practice in the Second Circuit, 1989–93,* 60 Brook. L.Rev. 491 (1994), it is not and cannot be binding. Holdings—what is necessary to a decision—are binding. Dicta—no matter how strong or how characterized—are not.

**3.** The issue—of a new sentence versus mere reconsideration—might be outcome-determinative, for example, if one of the parties sought to introduce evidence, relevant to sentencing, which involved events that occurred after the original sentence was imposed. And, in such a case the question of whether a new sentence was required might very well depend on whether our modified plain error rule survived *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), *ante,* at 226, and hence on whether the burden of showing "substantial injustice" rested on the government or on the defendant.