**David ASHWORTH, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0805–CR–448.

Court of Appeals of Indiana.

Feb. 20, 2009.

Transfer Denied April 23, 2009.

Michael R. Fisher, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issues

Following a jury trial, David Ashworth appeals his conviction and sentence for murder, a felony. On appeal, Ashworth raises three issues, which we restate as 1)

whether the trial court properly admitted opinion evidence from an investigating detective regarding the detective's elimination of two individuals as suspects; 2) whether sufficient evidence supports Ashworth's conviction; and 3) whether the trial court abused its discretion in sentencing Ashworth. Concluding that any error in admitting opinion testimony from the detective was harmless and that sufficient evidence supports the jury's guilty verdict, we affirm Ashworth's murder conviction. We also conclude, however, that the trial court abused its discretion in sentencing Ashworth because the sole aggravating circumstance of Ashworth's criminal history is insufficient to sustain his statutory maximum sentence of sixty years. As such, we affirm in part, reverse in part, and remand with instructions for the trial court to revise Ashworth's sentence to an enhanced term of fifty years.[1]

*Facts and Procedural History*

Lisa Summers was last seen riding her bicycle home around 12:30 a.m. on June 15, 1989, having finished her work shift at an Indianapolis Wendy's restaurant approximately one mile east of the I–465/38th Street interchange. Around that time, Shannon Pharis and Michelle Mason were in a vehicle at the intersection of 38th Street and High School Road several hundred feet east of the interchange, when they observed a woman in a Wendy's uniform riding toward the interchange on a bicycle. As the woman approached the interchange, Pharis and Mason observed a man walking quickly toward her. The man caught up with the woman after she dismounted from the bicycle (apparently due to a steep incline), and Pharis and Mason eventually lost sight of the two as

they walked over the 38th street bridge to the west end of the interchange. Pharis described the man as Caucasian, in his early to mid twenties, having shoulder-length, "dishwater" blond hair, transcript at 180, and walking with a "very significant" limp in his right leg, *id.* at 180, 187. Mason's description was similar, though she described the man's hair color as "dirty blond," *id.* at 208, and added that the man's limp "sticks out in my mind more than anything," *id.* at 207.

On June 19, 1989, while walking through a field southwest of the interchange, Ashworth and his friend, Michael McKinney, discovered a nude, partially decomposed body near a stand of brush. The body was later identified as that of Summers. Detective Earl Cooper of the Marion County Sheriff's Department began focusing his investigation on Ashworth after receiving Pharis's and Mason's description of the man they saw on June 15th and after observing Ashworth—particularly his limp—during an interview on June 20, 1989. Detective Cooper spoke with Ashworth again the following day, this time in the company of his wife, Diana. Although Ashworth's explanation of his whereabouts in the early morning hours of June 15th varied—he initially told Detective Cooper he had been drinking at a bar near the intersection of 34th Street and High School Road until approximately 12:30 a.m., but later in the interview said he was there until 2:30 a.m.—Diana told Detective Cooper that Ashworth was at home with her. The record is not clear whether Diana provided an alibi for Ashworth for the period after 12:30 a.m. or for the period after 2:30 a.m. only, but her explanation apparently satisfied Detective Cooper be-

1. Ashworth also seeks sentence revision under Indiana Appellate Rule 7(B) on the ground that his sentence is inappropriate in light of the nature of the offense and his character.

However, given our conclusion that the trial court abused its discretion in sentencing Ashworth, we need not address this argument.

cause his interest in Ashworth as a suspect waned.

Several years later, however, Detective Cooper refocused his investigation on Ashworth in light of two developments. First, in May 1991, Charlotte Ledbetter, whose husband was a friend of Ashworth's, told Detective Cooper she was driving eastbound on 34th Street on the morning of June 15, 1989, when she saw Ashworth walking in the same direction and offered him a ride home. Ashworth accepted and, during the ride, Ledbetter noticed that Ashworth had scratches on his face and that he "[l]ooked like he'd been rolling around in the dirt with somebody." *Id.* at 426. Ashworth told Ledbetter he got in a fight and had spent the night in jail. Ledbetter also told Detective Cooper that several days after Summers's body was discovered, Ashworth told her "not to tell anybody [about the ride home] because he didn't want me to get involved...." *Id.* at 430.

Second, at some point in 1992, Diana, having been divorced from Ashworth in December 1990, told Detective Cooper she lied to him about Ashworth's whereabouts on June 15, 1989. Diana stated that Ashworth came home around 6:30 a.m., immediately removed his dirty clothes, and placed them in the washing machine. According to Diana, this was unusual because she had never seen Ashworth do laundry before. Diana noticed marks on Ashworth's face, as well as several eight-inch scratches along his back that appeared to have been made by someone's fingernails. Diana did not observe these scratches when Ashworth left the house on the evening of June 14th. When questioned about them, Ashworth stated he was drunk and fell in some bushes. Regarding his whereabouts, Ashworth told Diana he had fallen asleep in a port-o-let on 34th Street. Diana also told Detective Cooper that she

lied to him because Ashworth told her to do so and that she was afraid of Ashworth.

These developments culminated in Detective Cooper obtaining a search warrant to retrieve a blood sample from Ashworth and also presumably comparing that sample with evidence recovered from the crime scene (the record is not entirely clear on this point), but no arrest followed. By December 2004, however, Detective Bill Rogers of the Marion County Sheriff's Department recommenced the investigation, which included obtaining a blood and saliva sample from Ashworth and submitting a bra and a cigarette recovered from the crime scene for DNA testing. The testing indicated that Summers's DNA was on the bra and that Ashworth's DNA was on both items.

On September 14, 2006, the State charged Ashworth with murder, a felony. From March 24 to 26, 2008, the trial court presided over a jury trial. Pharis, Mason, Ledbetter, Diana, McKinney, and Detectives Cooper and Rogers testified in their respective parts to the events described above, with McKinney adding that when he and Ashworth discovered the body, they were heading to Eagle Creek Park and that the route through the field—a route Ashworth chose—was indirect and required them to traverse through knee-high grass. McKinney also testified that his father offered to give the two a ride to the park, but McKinney declined because Ashworth insisted on walking. Finally, McKinney added that when he and Ashworth were walking through the field they saw a circling hawk, at which point Ashworth remarked, "The only time a hawk circles is when something's dead," *id.* at 371, and suggested that he and McKinney go to the area it was circling. The jury found Ashworth guilty, and the trial court entered a judgment of conviction based on the jury's finding.

On April 16, 2008, the trial court conducted a sentencing hearing, at which it found that Ashworth's criminal history was an aggravating circumstance and that there were no mitigating circumstances. Based on these findings, the trial court sentenced Ashworth to sixty years with the Department of Correction. Ashworth now appeals his conviction and sentence.

### Discussion and Decision

### I. Admission of Opinion Evidence

Ashworth argues the trial court improperly admitted opinion evidence from Detective Rogers regarding Rogers's elimination of two individuals as suspects. This court reviews the trial court's decision to admit evidence for an abuse of discretion. *Pickens v. State*, 764 N.E.2d 295, 297 (Ind. Ct.App.2002), *trans. denied.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

During direct examination, the prosecutor asked Detective Rogers his opinion regarding whether two individuals, Clayton Drayden and Andrew Broyles,[2] had any "involvement" in Summers's murder. Tr. at 457. Ashworth's counsel objected and received permission to ask a preliminary question, during which the following exchange occurred:

> Q You said there was an investigation as to [Drayden's and Broyles's] in-

volvement, was that investigation by you?

> A Partially, yes.

> Q Okay. Is your opinion based upon in part [on] what others did?

> A Yes.

*Id.* at 458. Ashworth's counsel then renewed his objection on the ground that Detective Rogers's opinion would be "based on the conduct of [an investigation] he didn't participate in" (that is, the "file" from Detective Cooper's investigation, which included Detective Cooper's notes and witness statements, *id.* at 445), but the trial court overruled the objection, reasoning that because Detective Rogers at least partially participated in the investigation (he testified he conducted some independent investigation, but did not specify what that entailed, *see id.*), his opinion regarding the involvement of Broyles and Drayden "goes to the weight of his opinion" and not its admissibility, *id.* at 458. Detective Rogers then opined that Drayden and Broyles "had absolutely nothing to do with this crime" because they provided inaccurate details about it. *Id.*

### A. Witness "Perception" and Indiana Evidence Rule 701

Ashworth argues the trial court abused its discretion when it allowed Detective Rogers to render this opinion because it was based in part on hearsay.[3] Ash-

---

2. Detective Cooper testified that Broyles implicated Drayden and himself as being involved in the murder and that in January 1990, Mason identified Broyles from a six-person photographic array as the man she may have seen on June 15, 1989. Detective Cooper added, however, that Mason was not "100 percent" sure the man was Broyles and that at various times Mason had identified others as possibly being the man she saw on June 15th. Tr. at 286.

3. We note as an aside that Detective Rogers's opinion that Drayden and Broyles "had abso-

lutely nothing to do with this crime" is a straightforward violation of the rule prohibiting opinion testimony regarding an individual's guilt or innocence in a criminal case. *See* Ind. Evid. Rule 704(b); *Taylor v. State*, 689 N.E.2d 699, 706 (Ind.1997). This was not the only instance the rule was violated. *See* Tr. at 456 (questioning Detective Rogers: "Q In your analysis of [this] case, did you—or do you also believe David Ashworth to have been involved with respect to this particular homicide? A Yes, I do."). Ashworth, however, did not object to either violation at trial and

worth's argument invokes Indiana Evidence Rule 701, which limits lay opinion testimony such as Detective Rogers's to opinions that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Our supreme court has defined "perception" within the meaning of Rule 701 as "the process, act, or faculty of perceiving .... insight, intuition, or knowledge gained by perceiving," and its verb form (i.e., "perceive") as "to become aware of directly through any of the senses, esp. sight or hearing." *Kubsch v. State*, 784 N.E.2d 905, 922 (Ind.2003) (citations omitted); *see also* 13 Robert Lowell Miller, Jr., *Indiana Practice, Indiana Evidence* § 701.102 at 399 (indicating that "perception" within the meaning of Rule 701 means "the facts on which the opinion is based must be within the witness's personal knowledge").

Because the record is unclear regarding the extent to which Detective Rogers's opinion is based on his own investigation, it is difficult to determine whether the opinion is based on his "perception" within the meaning of Rule 701(b). The opinion testimony would be inadmissible if, for example, Detective Rogers conceded it was based on a discussion with Detective Cooper during which Detective Cooper stated his belief that Drayden and Broyles had nothing to do with the murder. Under such circumstances, Detective Rogers's

opinion is merely a reiteration of Detective Cooper's and plainly not one based on his perception. If, on the other hand, Detective Cooper testified he based his opinion on interviews with Drayden and Broyles and a comparison of their explanations of the murder with evidence recovered from the crime scene, the opinion may be more accurately described as based on facts Detective Rogers perceived.

Although our research has not disclosed an Indiana case directly addressing whether opinion testimony that is based in part on an investigation conducted by someone other than the testifying officer is within the officer's perception, at least one decision has addressed the issue in the context of Federal Rule of Evidence 701.[4] In *United States v. Garcia*, 413 F.3d 201, 209–10 (2d Cir.2005), a DEA agent was permitted to testify over the defendant's objections that in his opinion the defendant was involved in a cocaine distribution ring. Noting that the agent's testimony regarding the basis for his opinion was laden with "information gathered by various persons in the course of an investigation," the court reasoned such an opinion could not accurately be described as based on the agent's personal perception. 413 F.3d at 213. As such, the court concluded the agent's opinion testimony was inadmissible under Federal Rule 701. *Id.*

### B. Harmless Error

■ The Second Circuit's opinion in *Garcia* supports interpreting "perception"

---

does not argue on appeal that these violations require reversal, and this court cannot reverse on grounds not argued by the appellant unless the violations constitute fundamental error. *See Wilke v. State*, 496 N.E.2d 616, 619 (Ind.Ct.App.1986). Because we conclude below that any error in admitting Detective Rogers's opinion testimony was harmless, *see infra*, Part I.B., it follows that any error also was not fundamental, *see Monegan v. State*, 721 N.E.2d 243, 255 (Ind.1999).

4. Federal Evidence Rule 701 contains an additional requirement that the opinion testimony "not be based on scientific, technical, or other specialized knowledge within the scope of Rule 702," but is otherwise identical to Indiana Evidence Rule 701. Given the similarity in language, our supreme court has stated that case law interpreting a federal rule is instructive in interpreting the Indiana rule. *Griffin v. State*, 754 N.E.2d 899, 903 (Ind. 2001).

within the meaning of Indiana Evidence Rule 701 as excluding officer opinion testimony that is based in part on a colleague's investigation. Nevertheless, we need not resolve this issue because even if the trial court improperly admitted Detective Rogers's opinion testimony, the resulting error was harmless. An error in admitting evidence does not justify reversal of a defendant's conviction unless the error affects the defendant's substantial rights. Ind. Appellate Rule 66(A); *Haycraft v. State,* 760 N.E.2d 203, 212 (Ind.Ct. App.2001), *trans. denied.* This court has observed that an error does not affect a defendant's substantial rights if "substantial independent evidence of guilt supports the conviction such that the reviewing court is satisfied that the erroneous admission of evidence played no role in the conviction." *Haycraft,* 760 N.E.2d at 212 (quoting *Udarbe v. State,* 749 N.E.2d 562, 567 (Ind.Ct.App.2001)).

The State presented substantial circumstantial evidence that Ashworth murdered Summers. The observations of Pharis and Mason shortly after midnight on June 15, 1989, indicate that a man matching Ashworth's description was walking quickly toward a woman matching Summers's description as the woman approached the I–465/38th Street interchange. Pharis's and Mason's descriptions of the man's hair and facial features are consistent with a photograph of Ashworth that Detective Cooper took on June 20, 1989, *see* state's exhibit 36, but the most compelling aspect of their descriptions was that the man walked with a significant limp in his right leg—the very same limp Ashworth had. Coupled with the observations of Pharis and Mason are the various explanations Ashworth provided regarding his whereabouts in the early morning hours of June 15th—he told Detective Cooper he had been drinking at a bar until either 12:30 a.m. or 2:30 a.m., his wife that he had fallen asleep in a port-o-let after falling in some bushes, and Ledbetter that he spent the night in jail after getting in a fight. The latter explanation was false, as Detective Cooper testified he confirmed through Marion County jail records that Ashworth had not been arrested. Further compounding the lack of explanation regarding Ashworth's whereabouts is that he told Diana to provide a false alibi and told Ledbetter not to tell anybody about the ride she gave him on the morning of June 15th. Moreover, these witnesses' observations of Ashworth that morning indicate he had been in a physical altercation. To Ledbetter, it appeared Ashworth had "been rolling around in the dirt with somebody," tr. at 426; Diana's testimony was more damning:

Q Can you describe the marks that you saw on his back for the jury?

A The marks were—the only way that I can describe them is like somebody took and went like that (guesturing [sic].)

Q And you made a gesture of fingernails down the back?

A Yes, ma'am.

Q Do you know—can you tell the jury where approximately on the back you saw these marks?

A Shoulders—shoulder blades.

Q And going about how far down?

A They were maybe about eight inches long.

*Id.* at 398. Adding to the suspicion was Ashworth's conduct with McKinney. After insisting they walk, Ashworth chose an indirect route that required him and McKinney to traverse through knee-high grass. Finally, and perhaps most important, the presence of Ashworth's DNA on

the bra places him at the crime scene.[5] We conclude the foregoing constitutes sufficient evidence of guilt such that Detective Rogers's opinion testimony, even if erroneously admitted, did not play a role in Ashworth's conviction. Thus, it follows that any error by the trial court in admitting such testimony was harmless.

## II. Sufficiency of Evidence

■ Ashworth next argues that insufficient evidence supports his murder conviction. When a defendant challenges the sufficiency of the evidence supporting his conviction, this court "must affirm 'if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.'" *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005) (quoting *Alkhalidi v. State*, 753 N.E.2d 625, 627 (Ind.2001)). In reviewing such a challenge, this court neither reweighs evidence nor judges witness credibility. *Id.*

To convict Ashworth of murder, the State had to prove beyond a reasonable doubt that he knowingly or intentionally killed Summers. *See* Ind.Code § 35–42–1–1(1). Ashworth argues the evidence was insufficient to prove he killed Summers by advancing a theory that he left the DNA at the crime scene when he and McKinney discovered Summers's body. To support this theory, Ashworth claims in part that the DNA recovered from the bra is consistent with McKinney's testimony that Ashworth tripped over a bicycle shortly after the body was discovered. Putting to the side that Ashworth's theory is simply an invitation to reweigh evidence—an invitation our standard of review requires us to reject, *McHenry*, 820 N.E.2d at 126—implicit in Ashworth's theory is that the bra

was near the bicycle he tripped over. The problem for Ashworth, however, is that the evidence does not reasonably support such an inference; the evidence indicates instead that the bra was near a bush a few feet from Summers's body, *see* state's exhibit 19; tr. at 144 (evidence technician testifying that the bra was recovered from a "briar type bush . . . located north of the victim"), and McKinney testified that he never observed Ashworth closer than fifteen feet from Summers's body. Moreover, Detective Rogers testified that during a September 2006 interview, Ashworth denied touching Summers's body or the bra.

Having rejected Ashworth's argument as unsupported by the evidence and, in any event, an invitation for this court to reweigh evidence, the question remains whether sufficient evidence supports his murder conviction. We think it goes without saying that consistent with Part I.B. above, if there is substantial independent evidence of guilt apart from evidence that was erroneously admitted, then it follows that sufficient evidence supports Ashworth's conviction. Nevertheless, to briefly reiterate, the recovery of Ashworth's DNA from the bra, coupled with McKinney's testimony that he never observed Ashworth closer than fifteen feet from Summers's body and Ashworth's testimony that he never touched Summers's body or the bra, supports the reasonable inference that Ashworth did not leave his DNA on the bra when he and McKinney discovered Summers's body. Coupling this inference with the observations of Pharis and Mason; the scratches on Ashworth's face and back; the inconsistent stories Ashworth told to Diana, Ledbetter, and Detective Cooper; Ashworth's conduct toward Diana and Ledbetter; and Ashworth's conduct

---

5. That a jury could not have reasonably concluded Ashworth left his DNA on the bra

when he and McKinney discovered the body is discussed in further detail in Part II below.

prior to his and McKinney's discovery of the body, it becomes clear there was sufficient, albeit circumstantial, evidence for a reasonable jury to conclude beyond a reasonable doubt that Ashworth murdered Summers.

### III. Propriety of Sentence

 Ashworth argues the trial court improperly sentenced him because his criminal history cannot support a statutory maximum sentence of sixty years.[6] In cases such as this one where the trial court imposes a sentence in excess of the presumptive sentence,[7] it must identify and explain all significant aggravating and mitigating circumstances and explain its balancing of the circumstances. *Roney v. State*, 872 N.E.2d 192, 198 (Ind.Ct.App. 2007), *trans. denied*. We grant a trial court considerable discretion in imposing sentences and will not conclude the trial court's decision is an abuse of discretion unless it is clearly against the logic and effect of the facts and circumstances before it. *Id.* Moreover, even if we conclude the trial court abused its discretion, "we have the option to remand to the trial court for a clarification or new sentencing determination, to affirm the sentence if the error is harmless, or to reweigh the proper aggravating and mitigating circumstances

independently at the appellate level." *Cotto v. State*, 829 N.E.2d 520, 525 (Ind.2005).

The trial court sentenced Ashworth to the statutory maximum sentence of sixty years[8] based on a single aggravating circumstance, Ashworth's criminal history. Although a defendant's criminal history is a valid aggravating circumstance, Ind. Code § 35–38–1–7.1(a)(2), our supreme court has stated that the weight afforded to such an aggravator "varies based on the gravity, nature and number of prior offenses as they relate to the current offense," *Wooley v. State*, 716 N.E.2d 919, 929 n. 4 (Ind.1999). Ashworth's criminal history consists of a felony conviction for burglary (the offense level is not specified) in 1980, a Class D felony conviction for theft in 1983, and misdemeanor convictions for battery and conversion in 1983 (the offense levels are not specified). With the exception of the battery conviction, none of Ashworth's prior convictions appear to involve physical harm to persons—burglary, theft, and conversion are ostensibly offenses against property, *see* Ind.Code article 35–43—and are therefore different in nature from the instant offense of murder. Battery is of a similar nature because it involves physical harm to persons, but because Ashworth's conviction was for a misdemeanor, we cannot say it is on the same scale as murder in terms of gravity.

---

6. Ashworth also argues the trial court improperly refused to find that his diagnosis of Parkinson's Disease was a mitigating circumstance. Ashworth, however, never offered this as a mitigating circumstance, and, with the exception of a guilty plea, *see Anglemyer v. State*, 875 N.E.2d 218, 220–21 (Ind.2007) (opinion on reh'g), a trial court cannot be said to have abused its discretion for refusing to find a mitigator not advanced by the defendant, *see Pennington v. State*, 821 N.E.2d 899, 905 (Ind.Ct.App.2005).

7. The presumptive sentencing scheme applies in this case because Ashworth committed the instant offense well before April 25, 2005, which is the date Indiana's advisory sentenc-

ing scheme became effective. *See Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind.2007), *clarified on reh'g*, 875 N.E.2d 218.

8. At the time Ashworth committed his crime, the presumptive sentence for murder was forty years, and the statutory maximum was sixty years, Ind.Code § 35–50–2–3 (1988), assuming the State did not seek a sentence of death or life without parole. Currently, the advisory sentence for murder is fifty-five years, and the statutory maximum is sixty-five years, Ind.Code § 35–50–2–3, again assuming the State declines a sentence of death or life without parole.

As such, we are left with a criminal history that is perhaps significant in terms of the number of offenses, but relatively insignificant in terms of nature and gravity as related to the instant offense of murder. We do not think such a criminal history can sustain a statutory maximum sentence, and therefore conclude the trial court abused its discretion when it sentenced Ashworth. Instead of remanding to the trial court, we elect to reweigh this aggravating circumstance at the appellate level and find that it is of moderate weight. Moreover, because our supreme court has recognized that a single aggravating circumstance may justify a sentence in excess of the presumptive, *Miller v. State,* 716 N.E.2d 367, 371 (Ind.1999), and, more to the point, because Ashworth's counsel conceded at the sentencing hearing that a "somewhat" enhanced sentence "would be justified," tr. at 700, we conclude that Ashworth's criminal history warrants an enhanced term of fifty years.

*Conclusion*

Any error by the trial court in admitting opinion testimony from Detective Rogers was harmless, and sufficient evidence supports Ashworth's murder conviction. The trial court, however, abused its discretion when it sentenced Ashworth because the sole aggravating circumstance of Ashworth's criminal history is insufficient to sustain his statutory maximum sentence of sixty years. We therefore affirm in part, reverse in part, and remand with instructions for the trial court to revise Ashworth's sentence to an enhanced term of fifty years.

Affirmed in part, reversed in part, and remanded.

CRONE, J., and BROWN, J., concur.