

IN THE

# Court of Appeals of Indiana

Richard Lawrence-Ari Brooks, Jr.,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

FILED

Jan 31 2025, 10:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

January 31, 2025

Court of Appeals Case No.
23A-CR-2602

Appeal from the Monroe Circuit Court

The Honorable Valeri Haughton, Judge

Trial Court Cause No.
53C02-2105-F3-369

**Opinion by Judge May**
Judges Brown and Pyle concur.

**May, Judge.**

[1] Richard Lawrence-Ari Brooks, Jr., appeals his three convictions of Level 3 felony child molesting.[1] During trial, Brooks challenged the admissibility of evidence collected following a ping[2] of Brooks's cell phone based on police performing that ping without first obtaining a search warrant, and he also challenged the admissibility of evidence collected pursuant to a search warrant for which Brooks argued the police filed an intentionally invalid probable cause affidavit. The trial court admitted all evidence over Brooks's objections.

[2] On appeal, Brooks argues the trial court abused its discretion by admitting the evidence collected following the ping because that ping violated: (1) Indiana Code section 35-33-5-12, which limits police authority to use geo-location information available from cellular networks; (2) the Fourth Amendment of the United States Constitution; and (3) Article 1, Section 11 of the Indiana Constitution. Brooks also argues the trial court abused its discretion by admitting evidence collected pursuant to the search warrant that Brooks alleges the police thereafter obtained using a misleading probable cause affidavit. After considering Brooks's arguments, we affirm his convictions of Level 3 felony child molesting.

---

[1] Ind. Code § 35-42-4-3(a).

[2] Pinging a phone is a process whereby law enforcement can submit a formal request to a cell phone carrier for assistance locating the phone associated with a specific cell phone number on that carrier's network. "[I]f the carrier finds that information to be exigent or worthy of a ping, they will then provide the [location] information back to dispatch[.]" (Tr. Vol. 2 at 71.)

## Facts and Procedural History

During the months at issue, S.W. was a thirteen-year-old who lived with her mother, father, and brother near Bloomington, Indiana. S.W.'s parents homeschooled her after she was bullied at the local public school, and because S.W. was unable to interact with other students during school, she decided to try to meet people online. In the spring of 2021, S.W. started using an app called SnapChat to talk to strangers, and when her parents found out, they took away all of S.W.'s electronic devices. While S.W. did not have her electronic devices, she began using her great-grandmother's phone to access apps called Monkey and Omegle, which allow users to video chat with strangers and required S.W. to falsify her age as seventeen or eighteen years old. In May 2021, S.W.'s parents returned her computer, and she began playing games on Roblox, which is for children over thirteen years of age and allows users to interact only by chat.

In the first week of May, when S.W. was using Monkey on her great-grandmother's phone, she got paired with Brooks for a video chat. She asked Brooks if he lived in Bloomington, and he said "yes." (*Id.* at 203.) S.W. told Brooks that she was thirteen, and Brooks said "he was like 16 or something." (*Id.* at 217.) S.W. "kinda liked" Brooks, (*id.* at 204), so she gave him the number for her great-grandmother's phone, and the two talked on the phone. S.W. also downloaded SnapChat again and used it to talk to Brooks. In addition, Brooks and S.W. "friended" one another on Roblox so they could play games together. (*Id.* at 205-6.) When S.W. was with her great-

grandmother, S.W. would use her great-grandmother's phone to Facetime with Brooks. During one conversation, S.W. told Brooks about her family, her friends, and her school. She also told him that she was in seventh grade. Brooks told S.W. that he worked at Walmart, but he did not tell her about his family or friends.

[5] Just before Mother's Day weekend, S.W. asked Brooks if he wanted to meet in person, and he said yes. On Saturday, May 8, 2021, S.W. attended a family party for Mother's Day and, during that party, took her younger brother and two young cousins outside to play at a park. While they were playing, Brooks got out of his car in the parking lot. S.W. wanted to go talk to Brooks, but her brother insisted she stay with him. Brooks then got back into his car and drove away. Later that day, when S.W.'s parents were away from home, Brooks stopped by S.W.'s house to see her, and S.W. wanted to get into Brooks's car, but her brother pulled her away from the car.

[6] After S.W.'s parents had gone to bed that night, S.W. called Brooks, and he drove to her house to pick her up. S.W. got into his car, and Brooks drove to a parking lot a few minutes down the road. After he parked the car, S.W. and Brooks got into the back seat of the car. They kissed, both took off their clothes, they touched each other's bodies, and Brooks put his fingers into S.W.'s vagina. He tried to have intercourse with S.W. but was unable to achieve penetration. When Brooks took S.W. back to her parents' house, he told her she should shower, and she did. S.W.'s parents did not hear her leave or return that night.

[7] The next day, Sunday, May 9, 2021, when they chatted on Roblox, Brooks checked to make sure S.W. had showered when she returned home. They also made plans to get together again when S.W.'s parents were asleep. About 10:00 p.m. that night, Brooks and S.W. were talking on S.W.'s home telephone, and S.W. told Brooks to come get her. Twenty minutes later, S.W. left her house and walked to the end of the driveway for Brooks to pick her up in his car. When Brooks picked her up, he took her to a hotel in Bloomington and before they entered the building, he told her to tell anyone who might ask that they were "brother and sister." (*Id.* at 223.) In the room Brooks had rented, Brooks had both vaginal and anal sex with S.W., which was painful for S.W. She was "screaming, it hurts, it hurts" (*id.* at 227), but Brooks did not stop. After Brooks finished, S.W. noticed she was bleeding onto the sheets.

[8] Around 4:10 a.m. on May 10, 2021, S.W.'s parents called 911 to report their thirteen-year-old daughter missing from their house. One of the first officers to arrive at the residence was Lieutenant Allen Mullis of the Monroe County Sheriff's Office. S.W.'s parents reported the home phone "was laying on the floor beside where [S.W.] was last sleeping." (*Id.* at 6.) They had found the main entrance of the house standing open six or eight inches, and they did not know of any reason why S.W. would have run away. Because S.W. did not have a history of sleepwalking and the door was left open, Lieutenant Mullis became concerned "there was a possible abduction involved." (*Id.*)

[9] Lieutenant Mullis and S.W.'s mother checked the house to confirm that S.W. had not fallen asleep in an unexpected location, while another deputy walked

the grounds around the house, and two other deputies drove to check parking lots, playgrounds, churches, and other nearby locations. The deputies were in constant contact via radio, and none of them found any leads. Lieutenant Mullis began asking S.W.'s parents about S.W.'s access to social media and then asked them to determine whether there were any unknown phone numbers on the caller ID feature of the home telephone. S.W.'s mother noticed a phone number from area code 574 that she did not recognize (hereinafter "the 574 number"). The 574 number had called several times in the prior two days and was identified as belonging to "Richard Brooks." (*Id.* at 9.) S.W.'s parents did not know who Richard Brooks was.

[10] At 4:30 a.m., Lieutenant Mullis gave the 574 number to dispatch and asked dispatch to find out if the number was a land line or a cell phone and whether records indicated Bloomington police had had any encounters with the person who owned that phone. Police had not interacted with the owner of the phone, and the number was for a cell phone. Lieutenant Mullis asked S.W.'s mother to call the 574 number from her home phone to see if the owner would answer. The phone "rang and rang, [and then] went to voice mail that wasn't set up[.]" (*Id.* at 12.)

[11] At 4:50 a.m. Lieutenant Mullis contacted dispatch and asked them to start the process for pinging the 574 number. Lieutenant Mullis was concerned because "there were several hours unaccounted for," (*id.*), and the involvement of an unknown cell phone number meant there was a risk "she was being transported away from Bloomington[.]" (*Id.*) Around 5:00 a.m., dispatch received

information that the cell phone was in the vicinity of the Home2 Suites by Hilton in Bloomington, Indiana. Dispatch contacted the Home2 Suites and learned room 229 was registered to "Mr. Brooks[.]" (*Id.* at 13.) Dispatch shared this information with Lieutenant Mullis at 5:02 a.m. and informed him that officers from the Bloomington Police Department were on the way to Home2 Suites.

[12] Around 5:15 a.m., Bloomington Police Officers Sean Kincaid and Josh McCoy knocked on the door of room 229 at Home2 Suites, and Brooks answered the door. The officers asked if S.W. was there, and Brooks indicated she could not come to the door "because she was naked." (*Id.* at 96.) The officers explained that S.W. had been reported as a runaway, and Brooks "said that he thought that she had told him that she turned 18 within the last week." (*Id.*) Officer McCoy asked Brooks to tell S.W. to put on clothing and come into the hallway. Bloomington Police Officers separately transported Brooks and S.W. to the Sheriff's Office.

[13] Meanwhile, around 5:30 a.m. on his way back to the Sheriff's Office, Lieutenant Millis called Monroe County Sheriff's Office Detective Sergeant Nathan Peach for assistance with the investigation of possible crimes by Brooks. Detective Peach went to the Sheriff's Office and received a briefing. Detective Peach interviewed S.W. and then separately interviewed S.W.'s father. S.W. claimed to know only Brooks's first name and indicated she and Brooks had only kissed at the hotel. Detective Peach "felt that [S.W.] was omitting some things." (Tr. Vol. 1 at 7.) S.W.'s father told Detective Peach

that S.W.'s electronics previously had been taken away because she was "sexting on Discord App" (*id*. at 38) and she did not seem to comprehend the "danger that she might be putting herself in[.]" (*Id*.) After those interviews, Detective Peach released S.W. into her parents' custody.

[14] When S.W. and her parents arrived home, S.W. indicated she needed to use the restroom. S.W.'s mother thought S.W. "wasn't acting like herself," (*id*. at 87), so she followed S.W. into the bathroom. S.W. had blood in her underwear even though she had not yet started menstruating, and she began to cry and told her mother what actually had happened. S.W.'s parents called Detective Peach to give him the updated information, and Detective Peach indicated S.W. should go to the hospital for a sexual assault examination. Detective Peach met S.W. at the hospital and asked her if she had left any facts out of what she told him earlier at the police station, and she admitted that she and Brooks had sexual intercourse.

[15] That same day, Detective Peach drafted a probable cause affidavit in support of a search warrant for Brooks's phone and hotel room. A judicial officer signed the search warrant later that afternoon and then police executed the warrant. On May 12, 2021, S.W. was interviewed by Melissa Brown, a forensic interviewer with a child advocacy center, Susie's Place. On May 13, 2021, the State charged Brooks with three counts of Level 3 felony child molesting – the first alleged Brooks placed his penis in S.W.'s vagina, the second alleged he placed his penis in S.W.'s anus, and the third alleged he performed "digital penetration." (App. Vol. 2 at 20.)

On May 5, 2022, Brooks filed a motion that asked the court to suppress all evidence that was collected after the ping of Brooks's phone. Brooks alleged the use of geolocation technology "was not in compliance with I.C. 35-33-5-12, the 4th Amendment to the United States Constitution, or the Article 1 Section 11 of the Constitution of the State of Indiana[.]" (App. Vol. 2 at 31.) Brooks also claimed the search warrant for his cell phone and hotel room were based on "false information intentionally or recklessly included in the [search warrant] affidavit." (*Id*.) The court held a hearing on Brooks's motion to suppress on June 13, 2022. Lieutenant Mullis, Sergeant Dillion, and Detective Peach all testified. The trial court thereafter denied Brooks's motion.

Brooks's bench trial began on January 17, 2023. After hearing all the evidence, the court found Brooks guilty of all three charges. The court imposed three concurrent six-year sentences. By the time of sentencing, Brooks had served 256 days in jail and accrued 85 days of good time credit, and the court suspended the remainder of his sentence to probation.

## Discussion and Decision

Brooks challenges the admission of evidence at his trial. We review trial court decisions to admit evidence for an abuse of discretion. *McCoy v. State*, 193 N.E.3d 387, 390 (Ind. 2022). We reverse "only if the trial court's ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id*. When the trial court's decision involved determining the constitutionality of a search, we review that question of law de

novo. *Id.* We also apply a de novo standard of review to questions of statutory interpretation. *Landra v. State*, 177 N.E.3d 412, 415 (Ind. 2021). Brooks separately challenges the admission of all evidence collected following the ping of his cell phone and the admission of evidence collected pursuant to the search warrant for his phone and hotel room.

## 1. Ping of Brooks's Cell Phone

[19] Brooks asserts three arguments why the ping of his cell phone was improper. He contends each one should have independently led the trial court to exclude all evidence obtained after the ping of his phone. We address each argument separately.

### 1.1. Indiana Code section 35-33-5-12

[20] Brooks first argues the trial court should have excluded the evidence against him pursuant to Indiana Code section 35-33-5-12(a). That statute provides:

> (a) A law enforcement officer or law enforcement agency may not use a real time tracking instrument that is capable of obtaining geo-location information concerning a cellular device or a device connected to a cellular network unless:
>
>> (1) the law enforcement officer or law enforcement agency has obtained an order issued by a court based upon a finding of probable cause to use the tracking instrument; or
>>
>> (2) exigent circumstances exist that necessitate using the tracking instrument without first obtaining a court order.

Ind. Code § 35-33-5-12(a).[3] Our Legislature did not define the term "exigent circumstances" for purposes of this statute. *Johnson v. State*, 117 N.E.3d 581, 584 (Ind. Ct. App. 2018), *trans. denied*.

[21] The Monroe County Sheriff's Office did not obtain a court-ordered search warrant based on probable cause prior to requesting the cellular carrier conduct a ping of Brooks's phone. According to Brooks, the ping of his phone also was not necessitated by exigent circumstances because the circumstances around S.W.'s absence from her home "point[ed] to a runaway situation, not a kidnapping." (Appellant's Br. at 12.) He also argues there was "nothing linking" the 574 number on the home telephone's caller identification log to S.W.'s absence from her home. (*Id*. at 13) (emphasis removed).

[22] At the hearing on Brooks's motion to suppress, Lieutenant Mullis explained that he did not request a search warrant prior to pinging the 574 number because "time was of the essence, in my opinion, missing 13 year old girl, so we didn't waste time, we just got the ping." (Tr. Vol. 1 at 13.) The factors that informed his conclusion that time was of the essence were S.W.'s age being thirteen, the home's door being left open, her parents not knowing a reason why or how S.W. would leave, no one answering the 574 number when called from S.W.'s home phone, the 574 number being a cell phone number, and the

---

[3] Indiana Code section 35-33-5-12(b) indicates police departments are required to seek a court-ordered search warrant based on probable cause within seventy-two hours of conducting a ping based on exigent circumstances. As Brooks presents no argument under that subsection, we need not quote it in full.

cell phone being registered to someone who lived near South Bend. When asked specifically about the Indiana Code's requirement for exigent circumstances, Lieutenant Mullis testified: "I believe that I have exigent circumstances. That's why we did it. . . . I have a missing 13 year old. And it could be a possible abduction, but I don't know until I find her." (*Id.* at 18.)

[23] Sergeant Bennett Dillion of the Monroe County Sheriff's Department testified at that same hearing that "Time is of the essence with children typically," (*id.* at 21), because, while adults have routines and known acquaintances away from home, children quickly begin to "associate with people that they may not know or others may not know." (*Id.* at 22.) Sergeant Dillion also explained the increased concern he had based on the fact that S.W. left home without any communication device, which is unusual for a teen, "especially if they're going to sneak out of the house without their [parents'] permission[.]" (*Id.* at 26.)

[24] While S.W.'s absence could have been a runaway situation, S.W. had no history of running away, and her parents did not know why she would have run away on the night in question. S.W. was only thirteen years old, she left home without a communication device, and the home's door was left open despite the family having pets that might get lost. The 574 number was the only number on the caller ID that S.W.'s parents did not recognize and, while it may not have been connected to S.W.'s disappearance, there was no way to confirm that without making contact with the person who owned the phone. As Brooks did not answer his phone when S.W.'s mother called, conducting a ping of the phone was the best remaining option for determining whether that phone was

related to S.W.'s absence. As Lieutenant Mullis noted, "there were several hours unaccounted for," (*id*. at 12), and the involvement of an unknown cell phone number meant there was a risk "she was being transported away from Bloomington[.]" (*Id*.) Given all these circumstances, we hold police had the exigent circumstances required to ping Brooks's cell phone under Indiana Code section 35-33-5-12(a).

### 1.2. Fourth Amendment

[25] The Fourth Amendment to the United States Constitution prohibits most warrantless searches and seizures. *Ramirez v. State*, 174 N.E.3d 181, 190 (Ind. 2021). There are, however, "a few specifically established and well-delineated exceptions." *Id*. (quoting *Katz v. United States*, 389 U.S. 347 (1967)). One well-established exception is "when exigent circumstances make law enforcement needs so compelling that a warrantless search or seizure is objectively reasonable." *Id*. When asked to determine whether exigent circumstances existed, we look at "the totality of the circumstances to decide whether police 'faced an emergency that justified acting without a warrant.'" *Id*. (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). "Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Carpenter v. United States*, 585 U.S. 296, 319-20 (2018).

[26] In *Carpenter*, the Supreme Court of the United States considered the Fourth Amendment implications of government access to historical cell-site location

information ("CSLI"), which cellular carriers store up to five years for business purposes and which the government could use to determine the historical location of any cell phone at any moment during the timeframe stored. 585 U.S. at 300-01, 312. The Court held a citizen has "a legitimate expectation of privacy in the record of his physical movements as captured through CSLI" and the government's seizure of that information from cellular carriers was a search for Fourth Amendment purposes. *Id*. at 310. While *Carpenter* limited its holding to historical CSLI data, *id*. at 316 ("We do not express a view on matters not before us: real-time CSLI . . . ."), we see no logical reason not to hold that the same privacy concerns demand that access to real-time cell phone location information also be considered a search for Fourth Amendment purposes. *See Govan v. State*, 116 N.E.3d 1165, 1172 (Ind. Ct. App. 2019) ("In any event, for purposes of this opinion we assume Govan had a reasonable expectation of privacy in his real-time cellular phone location data[.]"), *trans. denied*. Accordingly, the State needed a warrant to access Brooks's cell phone location information unless the State could demonstrate an exception to the warrant requirement. *See id*. (addressing existence of exigent circumstances for search conducted without warrant).

[27] "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The unexplained disappearance of a thirteen-year-old girl from her rural home in the middle of the night, especially when that child has no history of running away, constitutes an

exigent circumstance that justifies a warrantless ping of an unknown cell phone number, when that unrecognized phone number is the only lead for where the child could be and when the owner of the unrecognized number did not answer the phone when it was called. *See, e.g.*, *Govan*, 116 N.E.3d at 1174 (exigent circumstances justified warrantless seizure of real-time cell phone location data when police believed defendant had committed violent felonies and was an ongoing threat to others). Accordingly, Brooks's argument that the ping violated the Fourth Amendment fails.

### 1.3. Article 1, Section 11

[28] Brooks also asserts the ping of his phone was improper under Article 1, Section 11 of the Indiana Constitution. Although the wording of our State's constitutional provision is nearly identical to the federal provision, it has been independently interpreted to require the State to demonstrate "a particular search or seizure was reasonable based on the totality of the circumstances." *Ramirez*, 174 N.E.3d at 191. To assess the reasonableness under the circumstances, we evaluate three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[29] Evaluating the degree of suspicion involves looking at all the information available to police at the time of the search or seizure. *Ramirez*, 174 N.E.3d at

191. The degree of suspicion that the 574 number was involved in S.W.'s disappearance was medium. The 574 number was the only number on the home phone's caller ID that S.W.'s parents did not recognize. S.W. did not have a cell phone on which she could have received telephone calls. Police had found no other leads in the house, around the house, or in the surrounding areas of the community. S.W.'s parents did not have any other ideas where S.W. could have gone. While there was no guarantee that the 574 number had any connection to S.W.'s disappearance, it was the only lead police had at 4:50 a.m.

[30] Next, we evaluate – from the defendant's perspective – the degree of intrusion imposed on the defendant's normal activities by the police activity. *Ramirez*, 174 N.E.3d at 192. We consider intrusions into both physical movement and privacy. *Id*. Undoubtedly, the State learning the location of a citizen at any moment in time is an invasion of a citizen's privacy. *See, e.g., Carpenter*, 585 U.S. at 310 (citizens have a reasonable expectation of privacy in their historical location data). However, the ping of the phone for its location would not necessarily intrude into that citizen's physical movement. Physical intrusion occurs only if police thereafter stop the person. For example, herein, the ping resulted in physical intrusion into Brooks's activities only because police knocked on the door of Brooks's hotel room at 5:15 a.m. to ask him if he had any information about S.W. If Brooks had had no information about S.W. - and a plausible explanation for his phone calls to S.W.'s home - then his interaction with police would have constituted only a minor interruption of his

day. Balancing the high privacy intrusion and the minor physical intrusion, we determine the degree of intrusion from this warrantless ping was moderate. *See McGhee v. State*, 192 N.E.3d 1009, 1017 (Ind. Ct. App. 2022) (determining intrusion was moderate when police conducted warrantless seizure of cell phone location information), *trans. denied*.

[31] Third, "we consider the extent of law enforcement needs." *Ramirez*, 174 N.E.3d at 192. Our consideration includes not just what the police did, but also the circumstances in which the police action occurred. *Id*. Here, as we have discussed above, the police need was extremely high. A thirteen-year-old girl was missing from her home without explanation in the middle of the night, she could have been absent from the home for five or six hours, and time was of the essence in finding her before harm befell her. The 574 number, which had called the home telephone multiple times in the days prior but was unknown to S.W.'s parents, was the only lead police had about how or why S.W. had disappeared from her home. When the owner of the phone did not answer the call from S.W.'s mother, the need to locate the phone and its owner to determine whether that person had any knowledge about S.W.'s disappearance increased.

[32] In summary, although the suspicion was only moderate and the intrusion was also moderate, we cannot say the ping of Brooks's phone was unreasonable under the Indiana Constitution when the police need to find a missing thirteen-year-old girl was extremely high. *See McGhee*, 192 N.E.3d at 1017 (holding "warrantless search and seizure of" defendant's cell phone location data did not

violate Indiana Constitution when officers believed defendant was last person to see woman who had been missing for forty-eight hours).

## 2. Search Warrant Affidavit

[33]     Brooks also argues the trial court abused its discretion in admitting any evidence collected from Brooks's phone and hotel room because Detective Peach provided "an invalid probable cause affidavit" in support of the search warrant that granted police permission to search those areas.  (Appellant's Br. at 14.)  However, as the State notes, if the admission of evidence collected from Brooks's phone and hotel room was erroneous, that error was "harmless at most."  (Br. of Appellee at 24.)

[34]     Alleged errors are harmless if their "probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties."  Ind. Appellate R. 66(A).  We do not reverse a trial court's judgment based on harmless error.  *See id.* (errors and defects do not justify reversal when errors are harmless).

[35]     Brooks's convictions rest on the testimony of S.W., the results of the SANE examination, and the results of the DNA testing that identified Brooks's DNA in samples collected from S.W.'s body.  None of those forms of evidence were collected from Brooks's phone or hotel room, and Brooks has not directed us to specific pieces of evidence from his hotel room or phone that would have had any impact on the determination of his guilt.  We accordingly hold any alleged error in the admission of the evidence collected pursuant to the search warrant

was harmless. *See*, *e.g.*, *Ashworth v. State*, 901 N.E.2d 567, 674 (Ind. Ct. App. 2009) (admission of detective's opinion testimony, if erroneously admitted, was harmless when the record contained so much other evidence of Ashworth's guilt that the detective's opinion likely had no impact), *trans. denied*.

## Conclusion

[36] The trial court did not abuse its discretion when it denied Brooks's motion to suppress based on the police ping of Brooks's phone, as Brooks has not demonstrated the ping was improper under the applicable statute or either constitution. Considering the overwhelming evidence of Brooks's guilt from other sources of evidence, any error that might have occurred when the trial court admitted evidence collected from his phone and hotel room pursuant to the search warrant was, at most, harmless. We accordingly affirm the trial court's judgment.

[37] Affirmed.

Brown, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Lawrence F. Stropes
Monroe Co. Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana